SUN VALLEY IOWA LAKE ASS'N, Appellee,

v.

Clinton W. ANDERSON, Wendell J. Sollars, and Sky View Financial, Inc., Appellants,

and

Patten Corp. of Iowa and Patten Corp., Appellees.

SUN VALLEY IOWA LAKE ASS'N, Appellee,

v.

Clinton W. ANDERSON and Wendell J. Sollars, Appellants,

and

Sky View Financial, Inc., Appellee,

and

Patten Corp. of Iowa and Patten Corp., Appellees.

No. 95–24.

Supreme Court of Iowa.

July 24, 1996.

Patrick W. O'Bryan, Des Moines, for appellants.

Louis R. Hockenberg and James G. Sawtelle of Sullivan & Ward, P.C., Des Moines, for appellee Sun Valley Iowa Lake Association.

Douglas F. Staskal of Brick, Gentry, Bowers, Swartz, Stoltze, Schuling & Levis, P.C., Des Moines, for appellees Patten Corporation of Iowa and Patten Corporation.

Considered by LARSON, P.J., and LAVORATO, NEUMAN, SNELL, and TERNUS, JJ.

LAVORATO, Justice.

The primary issue in this equity action involves the ownership of common areas in a real estate development. A developer sold its interest in the development together with the common areas to a corporate purchaser. An existing homeowner's association sued the developer, the corporate purchaser, and the purchaser's two shareholders. The association asked the district court to require the defendants to transfer the common areas to the association. The corporate purchaser in turn cross-petitioned against the developer for breach of express warranties of title in connection with the sale.

The district court awarded the common areas to the association. The award was subject to the corporate purchaser's use of office space in the clubhouse. The district court had designated the clubhouse as a common area.

The district court also (1) foreclosed liens for assessments against lots the two shareholders had purchased from the corporate purchaser, (2) assessed attorney fees against all the defendants, and (3) assessed damages against the developer in favor of the corporate purchaser.

We affirm on the corporate purchaser's appeal and the developer's cross-appeal; we also affirm on the association's cross-appeal.

## I. *Background Facts.*

In about 1970, Quenton V. Anderson began selling parcels of land he owned near Ellston, Iowa. Ellston is in Ringgold County. Quenton enhanced what was originally farmland by (1) building a dam to create a lake, (2) installing a water and sewer system, (3) constructing roads, (4) building a golf course and marina, and (5) erecting a clubhouse. He called the development Sun Valley Lake in which he planned to develop 2800 lots.

In time the buyers of Quenton's parcels formed the Sun Valley Lake Property Owners Association (SVLPOA). SVLPOA collected annual assessments from each landowner and used the assessments for maintenance.

In 1988 Quenton sold a large part of the development to Patten Corporation (Patten). Patten paid $1.6 million for the project. Quenton, through his corporation Sun Valley Lake, Inc., retained ownership of the marina and the golf course.

Patten spent another $1.8 million installing and upgrading roads, constructing additional amenities, and remodeling the clubhouse. In addition, Patten hired a full-time staff of sales personnel—many of whom lived in the development—to sell development lots.

Later, Patten established a second landowners association, Iowa Lakes Association (ILA). Patten formed ILA to provide a vehicle through which the association members would own, maintain, and operate the common areas of the development in perpetuity.

On April 6, 1988, Patten filed in the Ringgold County recorder's office a "declaratory statement of covenants and restrictions to run with the land" (covenant document) regarding the development. The covenant document contained a number of provisions. The most significant provisions were the following: (1) a covenant that all lots or parcels designated as common areas would be conveyed to ILA subject to the provisions of an agreement dated April 4, 1988; (2) a covenant providing common areas would be subject to reasonable rules promulgated by Patten prior to conveyance and to rules adopted by ILA after conveyance; (3) a right in Patten to continue to use the common areas after conveyance "pursuant to said agreement between [Patten] and [ILA]"; (4) an obligation imposed on Patten to maintain the

common areas prior to conveyance and on ILA after conveyance; (5) an exclusive reservation to Patten and its assigns to conduct commercial operations within the development and the right to retain lots designated commercial; (6) a covenant that, by reason of ownership, lot owners were to be members of the association; (7) an authorization in favor of ILA to levy annual assessments against all lots in the development except those owned by Patten and any successor developer; and (8) a provision for unpaid assessments to become liens enforceable by mortgage foreclosure against the lots assessed.

In addition, the covenant document defined common areas to mean

all of the real property designated as such in the supplemental declaration; all real property which may be later annexed to the development as common area, and all real property acquired by [ILA], whether from [Patten] or otherwise, together in each instance with all improvements which may be at any time constructed thereon, including parks and roads.

The supplemental declaration attached as exhibit A to the covenant document designates a series of roads as common areas.

Later in the covenant document, two additional provisions relative to the common areas appear:

B. COMMON AREAS. All lots or parcels in the development designated as common areas are and shall remain private property and [Patten's] recordation of a plat shall not be construed as a dedication to the public of any such common areas located therein.

1. OWNERSHIP. Subject to the provisions of an agreement dated April 4, 1988, [Patten] will convey all common areas to [ILA] free and clear of all liens and encumbrances (other than liens for taxes) but subject to such easements, rights-of-way and restrictions as then appear of record.

The April 4, 1988, agreement referred to in the covenant document was a contract entered into by Patten and ILA. The contract was called a "transfer agreement." The transfer agreement repeated portions of the covenants in the covenant document and was otherwise substantially consistent with the covenants. The transfer agreement, however, contained the following additional significant provisions.

First, Patten agreed to convey ownership of all common areas to ILA.

Second, transfer of ownership was to occur upon Patten's completion of the improvements already undertaken regarding the common areas. "Completion" was to be determined

by the engineer or engineers retained or employed by [Patten] to design or supervise or review the construction of a particular improvement. The certification of said engineer of completion shall, for purposes of this agreement, be binding upon the parties hereto.

The agreement identified the common areas as: (1) certain existing roads, (2) the lake, (3) appurtenant structures, (4) the lake access areas, (5) the boat slips to be placed on the lake, and (6) all additional property and improvements to be designated by [Patten] as common areas in the future.

Third, ILA agreed to be responsible for maintaining the common areas. ILA agreed to levy for maintenance purposes an annual assessment of no less than two hundred dollars per lot against each lot owner.

Last, the transfer agreement contained language binding the "successors and assigns" of Patten and ILA.

The Federal Housing and Urban Development corporation (HUD) required Patten to give lot buyers a property report. Patten's report—dated May 20, 1988—listed the lake, picnic area, tennis court, and two swim and beach areas as recreational facilities available at no cost to lot owners and maintained by Patten and ILA. The report stated that—with the exception of the two swim and beach areas—all areas were 100% completed. The report also stated the vast majority of roads within the "units" or subdivisions listed were estimated to be completed by December 1988.

On May 15, 1989, Patten and the two associations—SVLPOA and ILA—entered into an agreement calling for the merger of

the two associations. Among other things, the parties agreed to do the following.

First, the agreement was not to be binding unless approved by two-thirds of the members of each association. Second, the two associations would attempt to merge, with the surviving association to be called the Sun Valley Iowa Lake Association (SVILA). Third, SVLPOA would attempt to have the April 6, 1988, covenants made applicable to the lots Quenton sold before Patten entered the picture. Fourth, if the covenants were made applicable to the lots Quenton sold, then all lot owners would be required to be members of the surviving association—SVILA. Fifth, SVILA would be responsible for maintenance of the common areas. The annual maintenance assessment would be $200 per lot. Sixth, the agreement defined the common areas to include the lake, roads, and green areas. Patten was required to bear the cost of future construction or capital improvements to such areas until Patten conveyed them to SVILA. Last, Patten would "have the right, but not the duty, to convey any existing common property to the new SVILA and, any newly constructed common property, at any time after it is certified to be completed by the engineer employed to supervise the construction thereof."

The two associations merged effective November 1, 1989. The merger document provided that those who purchased lots from Quenton had the option to become members of SVILA, the surviving association. Those members who purchased lots after April 6, 1988, had to be members of SVILA. The merger agreement expressly provided that the merger did not affect the covenant agreement dated April 6, 1988.

On December 1, 1989, Richard Salzenstein, Patten's general manager, wrote to the Ringgold county assessor. In the letter, Salzenstein identified certain lots as designated "greenbelt or common areas." The letter stated that six of the lots had gazebos.

On January 11, 1990, the SVILA president wrote to Patten expressing the association's concern about paragraph 22 of the May 15, 1989, merger agreement. As mentioned, that provision stated Patten would have the right, but not the duty, to convey to SVILA the existing and newly constructed common areas. The letter explained that the association's board "evidently overlooked ... or never got the true meaning of [paragraph 22] when read." The letter goes on to say:

> According to [the way paragraph 22 is written,] Patten does not have to convey the roads, the lake, or clubhouse over to the property owners if they leave or sell out. In some of the meetings that we had with Patten Corporation when they bought Sun Valley development it was told by Patten that the existing common property would be conveyed to the property owners when Patten Corp. left. This is in our minutes of these meetings. Would it be possible to get an amendment to paragraph 22?

Patten responded in a letter dated March 5, 1990, stating:

> Patten Corporation appreciates your concern over the timing of the transfer of the amenities to the association.

> We think that there never has been any doubt but that those amenities would ultimately be transferred to the association. Therefore, we would like to take this opportunity to state, again, that the roads, the lake, the clubhouse, the lake access areas, the green areas and such other amenities as there may be from time to time, will be turned over to the association no later than the end of Patten Corporation's involvement in the project.

The March 10, 1990, SVILA board minutes refer to this letter.

By a written agreement dated August 6, 1992, Patten agreed to sell, and Sky View Financial, Inc. (Sky View), agreed to buy, Patten's interest in the development for $325,000. SVILA was unaware of this transaction.

Clinton Anderson and Wendell Sollars are the sole shareholders of Sky View. (Hereafter in this opinion we collectively refer to Sky View, Clinton, and Sollars as Sky View unless we indicate otherwise.) Clinton is Quenton's son.

By warranty deed dated August 17, 1992, Patten conveyed to Sky View all of its inter-

est in all lots Patten owned, undeveloped areas in proximity to the lake, and all of the areas that might be considered common areas. (The grantor in the deed is described as Patten Corporation, successor in interest of Patten Corporation of Iowa.) At this point the project contained over 600 platted and developed lots and approximately 160 acres of undeveloped land. After the transaction, Sky View deeded some of its lots to Clinton and Sollars. In addition, after this lawsuit was filed, Sky View deeded some of the land the district court ultimately designated as a common area to Sun Valley Lake, Inc., Quenton's corporation.

SVILA's board of directors met with Sky View to discuss transfer of the common areas back to the association. The parties met several times and then reached an impasse. Clinton and Sollars refused to pay their yearly assessments for the lots they held. SVILA filed liens against their lots to recoup past due assessments.

At the time of trial, the liens remained in place. Sky View continued to refuse to transfer the common areas to SVILA, and the development remained uncompleted.

## II. *Background Proceedings.*

SVILA filed a two-count petition in equity on April 23, 1993. Count I was against Patten, Sky View, Clinton, and Sollars for breach of an obligation to convey to SVILA the common areas included within the development. SVILA prayed for an order requiring Sky View, Clinton, and Sollars to transfer the common areas to SVILA. SVILA also prayed for a permanent injunction precluding the defendants from claiming any ownership interest in the common areas or, in the alternative, money damages against the defendants for the common areas.

Count II prayed for personal judgments against Clinton and Sollars in the amounts of their delinquent association assessments, plus interest, attorney fees, and costs. Under this count SVILA also prayed for a judgment and decree in rem against all defendants to the action, establishing and foreclosing all liens SVILA held on the lots Clinton and Sollars owned plus interest, costs, and attorney fees. In addition, SVILA asked

that a receiver be appointed to oversee eliminating the indebtedness caused by Clinton's and Sollar's refusal to pay the yearly assessments on the lots they held. Later, SVILA dismissed Count II against Patten because this count failed to state a claim against Patten.

All defendants answered, denying liability. In addition, Patten raised several affirmative defenses.

Sky View filed a single-count cross-claim against Patten. Sky View alleged that if SVILA was entitled to disputed common areas, Patten had breached the express warranties of title in the sales agreement and warranty deed. Sky View asked for damages against Patten for the fair market value of the disputed common areas to which the court found SVILA entitled. Patten answered, denying liability and asking that the cross-claim be dismissed.

Following a bench trial, the district court found (1) SVILA was entitled to certain common areas, and (2) Sky View had suffered $60,000 in damages because of Patten's breach of the warranties of title. The court also found the covenants allowed SVILA to recover attorney fees incurred to enforce the terms of the covenants. Accordingly, the court awarded SVILA $16,000 in attorney fees and assessed these fees one-half against Patten and one-half against Sky View, Clinton, and Sollars. Finally, the court found Clinton and Sollars were not developers. The court granted SVILA's request for foreclosure against the lots they owned for non-payment of the annual assessments and the lien created by such non-payment.

In its findings and conclusions, the court directed SVILA to (1) prepare and submit a proposed decree in accordance with the court's findings and conclusions, (2) obtain an approval from the defendants as to the form of the decree, and (3) present the decree to the court for signature within forty-five days. Before the court finally signed the decree, it held three ancillary hearings and entered additional findings, conclusions, and orders.

Following the first ancillary hearing, the court awarded Sky View the right to occupy two sales and development offices in the

clubhouse. The order also directed the parties to agree upon the legal description of the clubhouse and the common areas and submit supporting surveys. If the parties could not agree on the legal descriptions, the court stated it would appoint a master to determine such descriptions.

The second ancillary hearing came about because the parties could not agree on the surrounding area to be included with the clubhouse. In the second ancillary order, the court adopted a legal description of such area prepared by SVILA's surveyor. The court ordered this area conveyed to SVILA as part of the clubhouse.

Following the filing of this lawsuit, however, Sky View deeded one of the parcels included in this legal description to Sun Valley Lake, Inc., Quenton's corporation. Nevertheless, in its second ancillary order, the court included this disputed parcel as part of the common areas to be conveyed to SVILA. The court made it clear that it was only deciding the ownership of this disputed parcel as between the parties to the suit. Because Sun Valley Lake, Inc., was not a party, the court was not deciding its interest in the parcel.

In the second ancillary order, the court also reversed its earlier finding that a particular beach and swim area should be awarded to SVILA.

A third ancillary hearing was necessary because Sky View claimed one of the documents the court relied on in determining what constituted common areas was allegedly not signed by the purported author. Sky View asked for a new trial on the basis of newly discovered evidence. *See* Iowa R.Civ.P. 244(g). In the alternative, Sky View asked the court to vacate the judgment under Iowa Rule of Civil Procedure 252. The court denied the motions and awarded $1200 in attorney fees in favor of SVILA and against Sky View for the hearing on the new trial motion.

The district court's decree awarded SVILA all of the common areas described in its original findings, conclusions, and order as modified by the subsequent orders following the ancillary hearings. The court's decree also (1) entered judgment for the attorney fees awarded in the court's original findings and for the fees awarded following the motion for new trial, (2) entered judgment for the past-due assessments and foreclosed the liens for those assessments, and (3) entered judgment against Patten for the $60,000 in damages awarded to Sky View.

Sky View appealed and SVILA cross-appealed from the district court's original findings, conclusions, and order; the three ancillary rulings; and the decree. Patten cross-appealed from the $60,000 judgment entered against it.

We consider the following issues:

1. Did the district court consider evidence barred by the statute of frauds?

2. Did Sky View have standing to raise the statute of frauds objection?

3. Did the district court err in its designation of the common areas?

4. Did Patten have an obligation to transfer the common areas when its involvement with the development ended?

5. Did Sky View have notice of SVILA's claim to the common areas?

6. Were Clinton and Sollars developers and therefore entitled to the exemption from assessments?

7. Did the district court err in awarding Patten $60,000 in damages against Sky View?

8. Is Sky View entitled to appellate attorney fees?

9. Did the district court err in granting Sky View the right to maintain offices in the clubhouse?

### III. *Scope of Review.*

■ Our review of equitable actions is de novo. Iowa R.App.P. 4. In our de novo review we examine the whole record, find our own facts, and adjudicate rights anew on issues properly before us. *Ide v. Farm Bureau Mut. Ins. Co.*, 545 N.W.2d 853, 856 (Iowa 1996). We give respectful consideration to the district court's fact findings, especially when witness credibility is an issue, but we are not bound by those facts. Iowa R.App.P. 14(f)(7).

## IV. *The Statute of Frauds.*

The first issue Sky View raises concerns the statute of frauds. Our statute of frauds is codified at Iowa Code section 622.32 (1987), and pertinently provides that

[e]xcept when otherwise specially provided, no evidence of the following enumerated contracts is competent, unless it be in writing and signed by the party charged or by his authorized agent:

. . . .

3. Those for the creation or transfer of any interest in land, except leases for a term not exceeding one year.

Sky View maintains the recorded documents (1) limited Patten's designation of the common areas to the completed roads, and (2) designated the common areas would be conveyed when an engineer certified that the project had been completed. Sky View complains the district court was greatly influenced by (1) unrecorded letters from Patten to the Ringgold county assessor, (2) oral statements by Patten salespeople to lot buyers, (3) sales brochures, (4) videotapes, and (5) transfer agreements. Sky View contends all of this evidence was admitted in violation of the statute of frauds.

■ Promises to convey interests in real estate fall within the ambit of the statute of frauds. *Peterson v. Petersen,* 355 N.W.2d 26, 27 (Iowa 1984). Those seeking to enforce such promises must do so by a preponderance of clear, satisfactory, and convincing evidence. *Id.* at 29.

■ Our statute of frauds does not render oral promises to convey invalid. Rather the statute relates merely to the manner of proof. The statute renders incompetent oral proof of such promises. *Recker v. Gustafson,* 279 N.W.2d 744, 748 (Iowa 1979). The statute, therefore, is a rule of evidence and not of substantive law. The statute is a defense and must be raised by answer or by objection to evidence at trial. *Johnson v. Ward,* 265 N.W.2d 746, 747–48 (Iowa 1978).

■ A. *Standing to object.* Preliminarily, we must dispose of SVILA's claim that Sky View had no standing at trial to raise the statute of frauds because it was not a party to any agreements between Patten and SVILA. It is true that generally only parties to the contract may invoke the statute of frauds defense. *Dioptron v. Dimmitt,* 245 Iowa 450, 456, 62 N.W.2d 749, 752 (1954). In *Dioptron,* this court approved the following rule found in 49 Am.Jur. *Statute of Frauds* § 594, at 901–02 (1943):

The rule that the defense of the statute of frauds is a defense personal to parties to the contract and their *privies* and cannot be invoked by third persons for their own benefit when the parties to the contract are willing to waive the requirements of the statute applies as well to creditors of a party as to any other strangers to the contract.

(Emphasis added.)

A later edition states:

As the rule is generally stated, parties to an oral contract, and their privies, but not strangers to the contract, may take advantage of the statute of frauds . . . .

Under the rule allowing privies of a party to an oral contract to claim the benefit or protection of the statute of frauds, *one who by contract of purchase and sale . . . has succeeded to the title to real property, is as a general rule permitted to assert the statute of frauds to defeat rights of a third person seeking to enforce a prior oral contract affecting the title to such property. Under this rule, a grantee claiming under a vendor who had orally agreed to sell the land to another succeeds to all the rights of his grantor and ordinarily may set up the defense of the statute against the enforcement of a previous oral contract of sale by his vendor.* This is based on the theory that the vendor in the oral contract of sale makes his election to avoid such oral contract by selling the property to the second purchaser. He thus exercises an unquestionable right, and the second purchaser may rely on that election.

73 Am.Jur.2d *Statute of Frauds* § 577, at 216 (1974).

■ Sky View claims title to the common areas from Patten, its vendor. In this proceeding SVILA claims (1) Patten had previ-

ously transferred all of Patten's interest in the common areas to SVILA and (2) SVILA is therefore seeking to enforce that transfer. Clearly, under the foregoing privity rule, Sky View had standing to assert a statute of frauds objection.

B. *The merits on the statute of frauds issue.* For reasons that follow, we decide this issue against Sky View. The following findings demonstrate the district court based its definition of common areas on written documents emanating from Patten:

The "common properties" are not defined in the covenants, but, instead, they provide that they are to be "designated." Exhibit A attached to the covenants and the first amendment to exhibit A do designate common areas, all of which are roads. Other than those documents, there is no formal designation of common properties.

The plat introduced as exhibit J reflects roads other than those which were designated by the formal documents. The testimony indicated that the roads, as reflected on the plat, can be physically located.

In addition, the letter from Patten, dated March [5], 1990, identified the "lake, the clubhouse, the lake access areas and the green areas and such other amenities as there may be from time to time."

The transfer agreement listed the lake, appurtenant structures, lake access areas and boat slips.

A letter from Patten's general manager, Richard Salzenstein, to the Ringgold County Assessor, and dated December 1, 1989, identified certain lots as designated "greenbelt or common areas."

The property report prepared by Patten, as required by HUD, dated May 20, 1988, and given to buyers, listed the lake, picnic area, tennis court, and two swim and beach areas as recreational facilities available at no cost to lot owners and maintained by the developer and association. All except for the two swim and beach areas were reported as 100% completed and the swim and beach areas were to be available for use by December, 1988. The same document also states that all roads within the "units" or subdivisions listed are estimated to be completed by December of 1988.

The court cannot correlate the "units" listed with the plat designated as exhibit J, but assumes that the property report is all inclusive as to the existing roads.

. . . .

The letter [to the assessor] indicates that six of the lots [designated as greenbelt or common areas] have gazebos on them. . . . The gazebos are listed as personal property on the bill of sale given to Sky View by Patten. Nevertheless, the covenants and transfer agreement contemplate "improvements" and are listed in Patten's letter to the assessor. As between Patten and [SVILA] they are considered a part of the common areas.

Based on the above documentation the court specifically finds that all lots designated by Patten in the December 1, 1989, letter to the assessor (exhibit 23), the roads, lake, picnic area (lot 500 and picnic area by the volleyball court), tennis court, two swim and beach areas (one west of lot 1075 and one by the picnic area) as per the property statement (exhibit 12) and the clubhouse, per the letter dated March 5, 1990 (exhibit 19), all to be common areas. Those areas have been "designated" and generally accepted as common areas. The court also finds that Patten warranted title to all of the above real estate to Sky View. The gazebos are considered part of the real estate, but no personal property is included.

■ The documents the district court relied on met the requirements of our statute of frauds. All of the documents were executed by representatives of Patten, the party charged. They were therefore admissible against Patten and its privy, Sky View.

■ Likewise, the sales brochures, videotapes, and salespersons' statements to prospective purchasers, all to the effect that Patten agreed to convey the common areas to SVILA, met the requirements of the statute of frauds. The sales brochures and the videotapes are in evidence. Some of the salespersons testified. All of this parol evidence was admissible against Patten and its privy, Sky View, under the general rule that

[p]arol evidence establishing an agreement for the creation of an interest in real estate may be admitted where the agreement is established by oral evidence of the adverse party.

*Gardner v. Gardner,* 454 N.W.2d 361, 363 (Iowa 1990).

Recently, one court dealt with the statute of frauds issue concerning common areas. *See River Birch Assocs. v. City of Raleigh,* 326 N.C. 100, 388 S.E.2d 538 (1990). *River Birch* presents yet another reason why the contested evidence here was admissible.

The facts in *River Birch* are somewhat similar to the facts here. At issue in *River Birch* was a three-acre parcel the plaintiff-developer sought to develop with town homes. One of the defendants—a homeowners association—claimed the developer had set aside the property as a recreational common area for the benefit of the association members. On appeal, the association prevailed on the statute of frauds issue. The court held that parol evidence was admissible to identify the boundaries and condition of the common area to be conveyed. *Id.* at 539–40.

In *River Birch* the contested evidence included (1) numerous affidavits from the association members, (2) an unrecorded preliminary plat, and (3) an unrecorded landscaping plan. The affidavits alleged the developer's sales agents had represented that the developer intended to convey the three-acre parcel to the association as a common area. The affidavits also alleged that the sales agents illustrated this intent by using the unrecorded preliminary plat and landscaping plan the developer submitted to the city. Significantly, the preliminary plat and landscaping plan depicted the three-acre parcel in dispute as a common area. The court agreed with the association that the unrecorded preliminary plat and landscaping plan were documents necessary to resolve a latent ambiguity in the "Declaration of Covenants, Conditions and Restrictions for the River Birch Subdivision." *Id.* at 551.

Similar to the facts here, the recorded covenants in *River Birch* stated that the developer would convey the common area to the association. Another article of the covenants defined common areas to include "all real property owned by the ... [association] for the common use and enjoyment of the owners." This article designated the common area as the real estate the association owned "at the time of the conveyance of the first lot."

The court in *River Birch* reasoned that such a general conveyance created an ambiguity regarding the identity and description of the common area. This ambiguous identity, the court said, was a latent ambiguity as distinguished from a patent ambiguity. The court explained the difference between patent and latent ambiguity this way:

> When a description leaves the land in a state of absolute uncertainty, and refers to nothing extrinsic by which it might be identified with certainty, it is patently ambiguous and parol evidence is not admissible to aid the description.... Whether a description is patently ambiguous is a question of law. A description is ... latently ambiguous if it is insufficient in itself to identify the property but refers to something extrinsic by which identification might possibly be made. Thus, a description missing or uncertain in one document may be rendered certain by another and together the documents may satisfy the statute of frauds.

*Id.* at 551–52 (citations omitted); *accord Nasco Land Dev. Co. v. Osborne,* 210 N.W.2d 638, 642 (Iowa 1973) (where description of property in written instrument, such as option agreement, is ambiguous, extrinsic explanatory evidence is admissible to explain ambiguity).

The court in *River Birch* focused on the language "at the time of the conveyance of the first lot" in the covenants. This language, the court said, "implies that there was more common area property which [the developer] intended to convey in the future." *River Birch,* 388 S.E.2d at 552. With the aid of extrinsic evidence, the court held that it could determine what the parties meant by "common area." *Id.* at 553.

The developer in *River Birch* contended that it always intended to develop the three-acre parcel and that its failure to label the

parcel "reserved for future development" was inadvertent error. The court rejected these contentions. The court noted that by the developer's own admission the term "common area" appeared on the preliminary plat and landscaping plan and the plat and plan depicted the three-acre parcel as common area. The court concluded that

> [b]y reference to the preliminary plat that [the developer] included in its complaint, we are able to determine that the "common area" referred to in the covenants includes the three-acre parcel in dispute. By the terms of its covenants, [the developer] is obligated to convey that parcel to the [association]. The trial court incorrectly excluded evidence of the preliminary plat for the purpose of resolving a latent ambiguity in the identity of common areas referred to in the covenants.

*Id.*

In addition, the court noted a city ordinance required the developer to indicate on both the preliminary site plan and on the landscaping plan the location of common area. The court held these documents were competent to resolve the ambiguity in the description of the common area. *Id.*

On the specific issue of the admissibility of individual homeowners' affidavits, the court in *River Birch* held that these affidavits were likewise admissible:

> The trial court should not have excluded affidavits of individual home owners describing the use of the preliminary and landscaping plats by sales agents to illustrate the location of the common area. This evidence was competent to show that the landscaping plan and preliminary plat were documents intended by the parties to identify the boundaries of the common area referred to in the covenants. This evidence[ ] tend[s] to show that the three-acre parcel is part of one contiguous area.
>
> *Parol assurances made by a developer to prospective buyers regarding the general scheme or plans of development that the developer intends to pursue are admissible to establish the existence of such a scheme. Such parol evidence may be in the form of a field map, sales brochures, maps, advertising or oral statements on which the purchasers relied.* In this case, the evidence establishes a general scheme of setting aside open space that included the three-acre parcel.

*Id.* at 553–54 (emphasis added) (citations omitted).

Clearly, Patten intended a general scheme or plan for developing Sun Valley Lake. It established a property owners association for maintenance purposes, spent substantial sums of money improving the development, and hired a full-time staff of sales personnel to sell the remaining lots. The covenant document and the April 4, 1988, transfer agreement were part of that scheme. The common areas included in the covenant document and transfer agreement were likewise a part of the scheme. Parol assurances Patten made to prospective buyers were admissible to show Patten's intention regarding the common areas. These assurances included statements sales personnel made to prospective buyers, sales brochures, and the videotapes. Also admissible were (1) Patten's representations to governmental authorities spelling out the common areas, and (2) the March 5, 1990, letter in which Patten assured SVILA it would transfer designated common areas no later than the end of Patten's involvement in the project.

All of this evidence was competent to clear up the latent ambiguity regarding common areas in the recorded covenant document. Except for roads, the covenant document did not define common areas. The covenant document did, however, subject Patten's obligation to transfer ownership of the common areas to the April 4, 1988, transfer agreement.

The transfer agreement made clear what the common areas were up to that point: certain existing roads, the lake, appurtenant structures, lake access areas, and boat slips. The agreement also made clear that Patten fully intended to construct additional common areas and intended to designate what those would be. In the agreement, Patten obligated itself to transfer all the common areas—those in existence and those to be constructed and designated in the future—to

the association upon completion of such areas.

Subsequent documents emanating from Patten designated those additional common areas to include (1) lots and gazebos listed in Patten's December 1, 1989, letter to the county assessor; (2) other roads, a picnic area, a tennis court, and two swim and beach areas all as listed in the May 20, 1988, HUD property report; and (3) the clubhouse as mentioned in Patten's March 5, 1990, letter to SVILA.

## V. *The District Court's Designation of the Common Areas.*

Sky View believes the district court erred in determining what the common areas were. It maintains the covenants designated only various roads in the development as common areas.

■ In our de novo review, we find by the preponderance of clear, satisfactory, and convincing evidence that Patten agreed to convey all of the areas the district court delineated in its original findings as modified by the following: (1) its orders following the ancillary hearings, and (2) exhibit A attached to the decree. Exhibit A legally describes the common areas. We earlier set out the documentary evidence and testimony establishing the proof of Patten's agreement to convey the common areas.

A general description of the common areas as finally determined by the district court includes the following: all lots and gazebos designated by Patten in the December 1, 1989, letter to the assessor; the roads; the lake; the picnic area (lot 500 and picnic area by the volleyball court); the tennis court; one swim and beach area; and the clubhouse.

■ A. *Deletions from the common area designation.* In its cross-appeal, SVILA contends the district court erred in not awarding it the boat slips, the maintenance building, and the campgrounds. SVILA argues (1) the transfer agreement designated the boat slips as a common area, and (2) Patten's former sales personnel testified that Patten had designated the boat slips, maintenance building, and campgrounds as common areas.

The district court in its original findings explained these deletions this way:

The developer also made an area lying west of the lake and platted ground available for use as a camping area for the lot owners, and a maintenance building has also been used by both the developer and the association. There is no documentation indicating that the maintenance building or the western camping area were designated as or intended to be common areas. There was also testimony that certain boat slips should be considered common property, but the testimony about the slips is confused as to location and identification, and although mentioned in the transfer agreement there is no other documentation supporting the association's contention.

According to these findings, the district court was not convinced that Patten intended the common areas to include the boat slips, maintenance building, and campgrounds. On our de novo review, we agree and adopt these findings as our own.

B. *Deletion of the swim and beach area previously awarded.* In its original findings, the district court found "two swim and beach areas (one west of lot 1075 and one by the picnic area)" were part of the common areas to be awarded to SVILA. Later, following the second ancillary hearing, the court amended its original findings by deleting one of the beach areas. It found there was only one area commonly used as a beach.

In its cross-appeal SVILA also complains about this deletion. It contends the second ancillary hearing was limited to testimony about the legal description regarding the clubhouse and the surrounding amenities. SVILA thinks the court erred by re-opening the record without a rule 179(b) motion. *See* Iowa R.Civ.P. 179(b).

■ The district court has broad discretion to re-open the record and consider additional testimony. *See In re J.R.H.*, 358 N.W.2d 311, 318 (Iowa 1984). Given the difficulty of establishing accurately the common areas and the additional testimony concerning the swim and beach area, we find no abuse of discretion here.

**635**

### C. *Conveyance following filing of suit.*

Following the second ancillary hearing, the district court included as part of the clubhouse a parcel of land extending 250 feet east of the clubhouse. Sky View had deeded this parcel of land to Sun Valley Lake, Inc., Quenton's corporation. The deed was recorded several days after this lawsuit was filed. Sky View challenges the court's designation of this disputed area as a common area because Sun Valley Lake, Inc., was not a party to these proceedings.

In its second ancillary order, the district court acknowledged (1) it could only determine the interests of the parties to this disputed parcel, and (2) Sun Valley Lake, Inc., was not a party. Contrary to Sky View's contention, therefore, the district court did not determine Sun Valley Lake, Inc.'s interest in the disputed parcel. The district court's order preserved whatever rights SVILA had in the disputed parcel. The order also preserved for SVILA a remedy against Sky View if Sun Valley Lake, Inc., later establishes a superior claim to the disputed parcel.

### VI. *Timing Regarding Patten's Obligation to Transfer the Common Areas.*

Although the district court found (1) Patten had agreed to transfer the common areas to SVILA and (2) what those common areas included, it still had to determine when that obligation would arise. Sky View contends the obligation was not ripe when Patten sold its interest in the development. To support its contention, Sky View points to two documents: the transfer agreement and the May 15, 1989, merger agreement.

■ A. *The transfer agreement.* As mentioned, the transfer agreement provides that Patten is to transfer the common areas upon completion of improvements. "Completion" is to be determined

> by the engineer or engineers retained or employed by [Patten] to design or supervise or review the construction of a particular improvement. The certification of said engineer of completion shall, for purposes of this agreement, be binding upon the parties hereto.

Sky View simply points out no engineer has ever certified that the improvements to the common areas have been completed.

Under the evidence presented, the district court found the improvements to the common areas had been completed within the meaning of the transfer agreement. For this reason, the court concluded, no engineer's statement was required to trigger Patten's obligation to transfer the common areas. We agree and adopt the court's finding and conclusion.

■ We further find that, by its subsequent conduct and representations, Patten waived the engineer's certification. Following execution of the transfer agreement, Patten represented to subsequent lot purchasers that it would transfer the common areas no later than such time as it left or sold its interest in the development to a third party. On this point Patten's former project director at the development testified as follows:

> Q. As far as what you told people or what you were instructed to tell people about the common areas, though, what did that entail? A. The entire sales force, including myself, because I was a selling sales manager, would tell a prospective buyer that there are certain common areas around the lake, which would include roads, tennis courts, gazebo areas that we couldn't build on, beach area, the clubhouse, that they would all be deeded over to the homeowners when Patten either sold the project, or Patten left, because we really don't know when we take over a project whether or not the project would be sold out or not.
>
> Q. Was the transfer to take place, then, on the earlier of those two conditions, or when exactly was this transfer to take place? A. Whichever happened first. I mean, that's the way we explained it to every prospective client that we had in front of us.
>
> Q. Were you instructed by your superiors at Patten to convey this information to the prospective clients? A. Of course, because it was a great selling point, and it was for the benefit of the prospective client and new lot owner.

Q. In your opinion, did those individuals who purchased land from Patten rely upon those representations? A. Very much so.

In addition, Patten's March 5, 1990, letter represents to SVILA that Patten would transfer the common areas no later than the end of Patten's involvement with the development.

B. *The May 15, 1989, merger agreement.* As mentioned, the merger agreement provided that Patten would "have the right, but not the duty, to convey any existing common property to [SVILA] and, any newly constructed common property, at any time after it is certified to be completed by the engineer employed to supervise the construction thereof." Sky View contends this language eliminated any duty on Patten's part to transfer the common areas to SVILA.

The district court found "the [merger] agreement did not, nor did the parties ever intend to, eliminate Patten's or its successor-in-interest's obligation to convey the common properties." In reaching this ultimate finding of fact, the court relied on (1) the covenant document, (2) Patten's subsequent conduct following the agreement, and (3) the March 5, 1990, letter from Patten to SVILA.

The district court reasoned as follows. The covenant document provided that Patten would convey the common areas to SVILA. The merger agreement provided that all lots sold after the merger agreement were subject to the recorded covenants. These covenants, of course, contained Patten's obligation to convey the common areas. The "right, but not the duty" language in the merger agreement created confusion. Patten's subsequent conduct cleared up that confusion. Its sales personnel continued to hand out the transfer agreement to all lot buyers. Its sales personnel also continued to represent that Patten would turn over the common areas at the end of Patten's involvement in the development. The March 5, 1990, letter from Patten to SVILA reassured SVILA that Patten intended to turn over the common areas to SVILA "no later than the end of Patten Corporation's involvement in the project."

Without saying so, the district court reformed the merger agreement to reflect the real intention of the parties. The rules governing reformation are well-established. The party who contends an agreement does not reflect the real intention of the parties must prove this contention by clear, satisfactory, and convincing evidence. *Kufer v. Carson*, 230 N.W.2d 500, 503 (Iowa 1975). The right to reform the agreement (1) lies within the discretion of the equity court, and (2) depends upon whether the remedy is "essential to the ends of justice." *Id.* at 504. The equity court will grant relief

if an instrument as written fails to express the true agreement between the parties without regard to the cause of the failure to express the agreement as actually made, whether it is due to fraud, mistake in the use of language, or anything else which prevented the instrument from expressing the true intention of the parties.

*Id.*

Before equity will reform an agreement,

a definite intention or agreement on which the minds of the parties had met must have preexisted the instrument in question. There can be no reformation unless there is a preliminary or prior agreement, either written or verbal, between the parties, furnishing the basis for rectification or to which the instrument can be conformed.

66 Am.Jur.2d *Reformation of Instruments* § 4, at 529 (1973).

Here, there was an agreement preexisting the May 15, 1989, merger agreement. The preexisting agreement provided that Patten would convey the common areas to SVILA when Patten ended its involvement in the development either by leaving or selling its interest to a third party. After the merger agreement, there was written evidence confirming what the original agreement was. The written evidence is in the form of the March 5, 1990, letter. Moreover, following the merger agreement, Patten continued to sell lots on the basis of the prior agreement.

Whatever the reason for the difference between the merger agreement and the preexisting agreement, the district court had adequate proof to reform the merger agreement to reflect the true intention of the parties. To do otherwise would not have served the ends of justice.

As between Patten and SVILA, Patten was obligated to transfer the common areas to SVILA when Patten either left or sold its interest in the development to a third party. The question remains, however, whether Sky View had notice of this obligation before Sky View purchased Patten's interest. That brings us to the next issue.

## VII. *Notice to Sky View.*

Sky View contends it is a subsequent bona fide purchaser and as such is entitled to the protection of our recording statutes. Under these statutes, Sky View argues it was never put on actual or constructive notice of the transfer agreement's existence. Because the transfer agreement was never recorded, Sky View asserts the district court erred by ordering it to convey the common areas under an unrecorded instrument. For the following reasons, we agree with the district court that Sky View had notice of Patten's obligation to transfer the common areas to SVILA before transferring its interest in the development to Sky View.

A. *Notice under the recording statutes.* Our recording statutes are found in Iowa Code chapter 558. Two sections are pertinent here, Iowa Code sections 558.41 and 558.55.

Section 558.41 states:

No instrument affecting real estate is of any validity against subsequent purchasers for a valuable consideration, without notice, unless filed in the office of the recorder of the county in which the same lies, as hereinafter provided.

Section 558.55 provides that

[t]he recorder must endorse upon every instrument properly filed for record in the recorder's office, the day, hour, and minute of such filing, and forthwith enter in the index book the entries required to be made therein, except the book and page where the complete record will appear, and *such filing and indexing shall constitute constructive notice to all persons of the rights of the grantees conferred by such instruments.*

(Emphasis added.)

We have recognized existing rights may be created apart from filings in the recorder's office:

Absent express notice given, a land purchaser generally has three established sources of information to which he should turn for ascertainment of existing rights in any property he proposes to buy: (1) the records in the county recorder's office where basic rights involved are recorded; (2) other public records, to discover existence of rights not always disclosed in the county recorder's office, i.e., judgments, liens and taxes; and (3) an inspection of the land itself, to determine by observation any rights which may exist apart from our recording system by virtue of occupancy, use or otherwise.

*Bartels v. Hennessey Bros., Inc.,* 164 N.W.2d 87, 94 (Iowa 1969).

A land purchaser, then, may have either constructive or actual notice of existing rights in a property. Compliance with the recording statutes affords constructive notice of these existing rights. *National Properties Corp. v. Polk County,* 351 N.W.2d 509, 511 (Iowa 1984).

Actual notice depends upon the purchaser having either (1) actual knowledge of the existing rights, or (2) knowledge of sufficient facts to charge the purchaser with a duty to make inquiry that would reveal the existence of such rights. *Id.* The test is this:

It is a well settled general rule, in determining whether a purchaser had notice of outstanding equities or unrecorded interests so as to preclude [the purchaser] from being entitled to protection as a bona fide purchaser, that if [the purchaser] has knowledge of circumstances which, in the exercise of common reason and prudence, ought to put a [person] upon particular inquiry, he will be presumed to have made inquiry, and will be charged with notice of every fact which such suggested investiga-

tion would in all probability have disclosed had it been properly pursued. The purchaser may not act in contravention to the dictates of reasonable prudence, or refuse to inquire when the propriety of the inquiry is naturally suggested by circumstances known to him.

*Raub v. General Income Sponsors,* 176 N.W.2d 216, 220 (Iowa 1970) (citation omitted).

■ A land purchaser has the burden to establish the status of bona fide purchaser. To do so, the purchaser must show the purchase was made without either actual or constructive notice of existing rights in the property. *Bartels,* 164 N.W.2d at 94.

B. *The merits on the notice issue.* With these principles in mind, we review the record de novo on this issue.

■ According to the testimony of Clinton and Sollars, Clinton was responsible for negotiating the sale between Patten and Sky View. Because Sollars relied on what Clinton knew and the information their counsel shared with them in deciding whether to enter the sales contract, whatever Clinton knew or should have known about Patten's obligation must be imputed to Sollars and Sky View. And likewise, whatever Sollars knew or should have known about Patten's obligation must be imputed to Clinton and Sky View.

Clinton insists he was unaware of the transfer agreement and its terms. In assessing his credibility on this issue, we must keep in mind that Clinton's father, Quenton, was the original developer and Patten's vendor. Clinton has lived at the development his entire life except for the time he spent in college. There was some testimony that Clinton had attended meetings of the association board and several of the association's annual meetings. These facts establish that Clinton had some first-hand knowledge of the development and SVILA.

At trial, Clinton acknowledged that before the sale he (1) had reviewed the recorded covenant document, (2) was aware the document required Patten to transfer the common areas to SVILA subject to the terms of the transfer agreement, and (3) had asked Patten for a copy of the transfer agreement.

Clinton claimed Patten's attorney told him there was no transfer agreement. Sky View, however, did not have Patten's attorney testify to corroborate this testimony. Sky View's failure to do so causes us to question whether Patten's attorney actually made this statement.

■ Clinton's knowledge about the unrecorded transfer agreement imposed upon Sky View the duty to make further inquiry. Sky View's duty to make further inquiry is heightened by Sollar's special knowledge about the development. For eleven years before Patten's sale to Sky View, Sollars knew some of the common areas were available and were being used by association members. He was aware these areas included the lake, a beach, access roads to the lake, the clubhouse, and the tennis court. His testimony on this point is very revealing on just how much he knew:

Q. So you've known over the last eleven years that at least some of the common areas that you've conceded have been available and used by the property owners? A. By the property owners and the developer.

Q. Did you ever stop to think that something gave these property owners the right to use these common areas? A. Yes.

Q. And what do you think gave them the right to use those common areas? A. My understanding was if you owned a home on Sun Valley Lake, you had a right to use the lake.

Q. Did you ever stop to think that there might be some legal documents or covenants or restrictions or something in writing that gave these people the right[ ] to use these areas? A. I thought this was—in my thinking I just felt that this was implied, that that's why I bought the property.

Q. So you just thought it was an oral situation or something that was unwritten? A. It was obvious.

Q. It was obvious that they had the right to use these common areas? A. Yes.

. . . .

Q. Did it ever occur to you to ask the property owners' association what right it had to use these areas? A. No.

Q. Never did? A. No. If you owned property you had the right to use them.

Q. When you bought this property did you think you were buying this property subject to these rights? A. When I purchased my property back in 1973, I bought a waterfront lot and if I'd have felt like I'd been denied the use of the lake, I would not have bought the lot.

Given this special knowledge, it seems to us incredulous that Sollars would not have been aware of Patten's commitment or agreement to transfer the common areas to SVILA before selling its interest in the development to third parties. In any event, prudence dictated that Sky View should have gone to SVILA before completing the purchase from Patten. Sky View should have inquired of SVILA what SVILA believed SVILA's rights were with respect to the common areas.

Had Sky View made further inquiry, it would have learned (1) what SVILA believed the common areas to be as delineated in all the past written documents, (2) that SVILA believed Patten had the obligation to transfer the common areas before any sale, and (3) that Patten in its March 5, 1990, letter had assured SVILA it would honor its obligation to make such a transfer. We therefore presume that Sky View made such an inquiry, and we charge Sky View with knowledge of what it would have learned. *See Raub,* 176 N.W.2d at 220. Because of this knowledge, Sky View should have refused to complete its purchase from Patten until Patten cleared title to the common areas. This refusal would have required Patten to either (1) negotiate with SVILA or (2) bring a quiet title or declaratory judgment action against SVILA to determine what rights, if any, SVILA had in the common areas.

We conclude Sky View was not a bona fide purchaser under our recording statutes. Sky

View therefore took the common areas subject to SVILA's existing rights in those common areas.

Because Sky View was not a bona fide purchaser, its rights could rise no higher than Patten's. With respect to the common areas, Sky View was subject to the same obligations that bound Patten. On this point a covenant document provision states in part: "The provisions of this Declaration shall affect and run with the land and shall exist and be binding upon all parties claiming an interest in the Development until January 1, 2015, after which time the same shall be extended for successive periods of ten (10) years each." The transfer agreement also has a provision on this point. It states: "This agreement shall be binding on the successors and assigns of the parties hereto."

Like the district court, we conclude Sky View is obligated to immediately convey to SVILA the common areas as we have defined them in division V of this opinion and as legally described in exhibit A attached to the district court's decree.

VIII. *Assessments and Lien Fore-*
 *closures.*

▉▉▉ The covenant document authorized SVILA to levy annual assessments against all lots in the development except lots "owned by [Patten] or any successor developer." SVILA used the assessments to finance the maintenance of the common areas, as well as other association activities.

In its original findings, the district court found neither Clinton nor Sollars, individually or jointly, was a developer within the meaning of the covenant document. The court therefore found SVILA had acted appropriately when it levied assessments against the lots Clinton and Sollars owned individually. In its decree the district court (1) entered judgment against Clinton and Sollars for the past-due assessments they allegedly owed, and (2) foreclosed the liens for those assessments. The assessments amounted to approximately $18,000.

Clinton and Sollars challenge the district court's finding that they were not developers. They contend Sky View was a successor de-

veloper under the covenant document. They further contend they, too, in their individual capacities, became successor developers.

Clinton and Sollars point to the following record evidence to support their claim that they are developers. Sky View intended to build larger projects such as condominiums. Clinton and Sollars, on the other hand, intended to build "spec houses" on their individual lots. Clinton and Sollars purchased over a hundred lake lots from Sky View. They (1) mowed and staked their individual lots, (2) plowed snow from the roads in front of these lots, (3) cleaned out the old brush, (4) built "spec homes," (5) reconstructed and graded roads, (6) entered into a dealership agreement for stick-built factory homes, and (7) advertised in local newspapers.

We adopt the following district court findings on this issue:

> Neither [Clinton] nor Sollars, individually or jointly, is a developer within the meaning of the covenants. Conversely, Sky View is a developer. The covenants do not contemplate multiple developers. The vacant, unplatted ground belongs entirely to Sky View. [Clinton] and Sollars have taken title individually to various lots for the purpose of building and not for the purpose of further developing the subdivisions involved. Recognition of multiple developers would likely place on some of them obligations created by the covenants and transfer agreements which individually they simply could not meet because of their inability to control other "developers." It is accordingly found that [the SVILA] has acted appropriately in levying assessments and foreclosing against the lots owned jointly and individually by [Clinton] and Sollars.

We think the district court was correct for yet another reason. Only *successor* developers are exempt from assessments. The covenants do not define "successor." According to one court,

> [t]he exact meaning of the word "successor" as applied to a contract must depend largely on the kind and character of the contract, its purposes and circumstances, and the context. As applied to corporations, "successor" does not ordinarily mean

an assignee, but is normally used in respect to corporate entities, including corporations becoming invested with the rights and assuming the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession. *The term "successor" has also been defined as "one who takes the place that another has left, and sustains the like part or character."*

*Enchanted Estates Comm. Assoc. v. Timberlake Improvement Dist.,* 832 S.W.2d 800, 802 (Tex.Ct.App.1992) (citations omitted) (emphasis added). We think the italicized definition of the term "successor" is what the parties intended "successor" to mean in the covenant document. Patten was responsible for the covenant document language. When it purchased the development from Quenton, Patten probably contemplated it might sell the development intact before ever completing it. Patten may have used the term successor developer to make any such potential sale more attractive by exempting the buyer from assessments against unsold lots.

But it was Sky View, not Clinton and Sollars, that took the place of Patten as to the whole development when Patten left. And it was Sky View, not Clinton and Sollars, that "sustain[ed] the like part or character" Patten had relative to the whole development.

### IX. *Damages and Attorney Fees.*

A. *Damages.* The district court awarded Sky View damages in its cross-claim against Patten for breaching the warranty of title. In making the award, the district court found there was little evidence to establish the reduction in value that would result from removing the common areas from all of the assets Sky View purchased. The court further found that there was only evidence as to the value of the clubhouse. Based on the limited evidence before it the district court awarded Sky View $60,000.

In its appeal Sky View contends the district court's damage award of $60,000 on its cross-claim against Patten was inadequate. Sky View complains that, when all reductions for this original award are considered, it will have a net award of about $32,000. Sky

View offered to sell SVILA the common areas, excluding the lake, for $750,000. Sky View wants us to increase the award against Patten to this amount.

In its cross-appeal, Patten contends the court's award of $60,000 is not supported by substantial evidence. Patten asks us to dismiss this claim. In support of its contention, Patten argues Sky View failed to show any damages resulting from the district court's award of the common areas to SVILA.

The gist of Patten's argument is that Sky View lost nothing of value in the bargain. Patten asserts that the disputed common areas were only of value to Sky View to the extent they were part of the total purchase price offered to potential lot buyers. Patten also asserts that Sky View's investment is primarily in the lots themselves and this litigation has not disturbed Sky View's investment. Finally, Patten asserts that no evidence was presented to establish that the clubhouse—which Sky View continues to use as a sales office—has an independent commercial value apart from the development.

Because the appeal and cross-appeal raise related issues on the damage question, we consider the contentions of both parties in this division.

The warranty deed from Patten to Sky View states in pertinent part:

[Patten] hereby covenants with [Sky View] ... that it holds the real estate by title in fee simple; that it has good and lawful authority to sell and convey the real estate; that the real estate is free and clear of all liens and encumbrances ... and it covenants to warrant and defend the real estate against the lawful claims of all persons. . . .

 The measure of damages for a complete failure of title to real estate is the value of the property at the time the covenant was made as determined by the consideration paid, rather than the land value at the time of the eviction. The measure of damages also includes interest, cost, and expense the covenantee incurs in unsuccessfully defending title. Generally, the measure of damages does not exceed the amount of consideration the grantor receives. *Woods v. Schmitt*, 439

N.W.2d 855, 867 (Iowa 1989) (citations omitted).

Patten, the grantor, received a consideration of $325,000. Sky View is limited to that amount.

 The party seeking damages has the burden to prove them. *Poulsen v. Russell*, 300 N.W.2d 289, 295 (Iowa 1981). There is a distinction between proof that a party has suffered damages and proof regarding the amount of those damages. *Larsen v. United Fed. Sav. & Loan Ass'n*, 300 N.W.2d 281, 288 (Iowa 1981). If the record is uncertain and speculative whether a party has sustained damages, the fact finder must deny recovery. *Id.* But if the uncertainty is only in the amount of damages, a fact finder may allow recovery provided there is a reasonable basis in the evidence from which the fact finder can infer or approximate the damages. *Id.*

As the district court found, Sky View produced scant evidence to establish the reduction in value resulting from removing the common areas from the total assets Sky View purchased. The sales contract assigns no value to the common areas.

 The only evidence of the common area's value Sky View produced concerned the clubhouse. For example, Quenton testified he thought the clubhouse was worth considerably more than the $112,000 to $118,000 taxable value. The district court found this evidence was neither based on nor related to the purchase price. It also found this evidence failed to take into consideration the developer's right to use the facility even though owned and maintained by the association. Nevertheless, we think the taxable value evidence was sufficient to sustain the district court's finding that the clubhouse constituted $60,000 of the $325,000 total purchase price. In our de novo review, we adopt this finding as our own. Like the district court we find no record evidence concerning the value of the other common areas.

B. *Attorney fees.* In its reply brief on the damage issue, Sky View for the first time seeks appellate attorney fees. Sky View claims it is entitled to such fees because (1) it

had to defend Patten's title against SVILA's cross-appeal to include additional property in the common areas designation, and (2) Patten allegedly acted in bad faith in inducing the contract. For several reasons we reject Sky View's belated claim for attorney fees.

First, because Sky View did not seek attorney fees in the district court, we doubt it can do so now. The attorney fees are an element of damages in this breach of warranty claim. *Kendall v. Lowther*, 356 N.W.2d 181, 190 (Iowa 1984). If a party does not seek an element of damages in the district court, there is no basis for an appellate court to award it.

Second, Sky View did not raise the bad faith claim in the district court. For that reason it cannot do so now. *See Peters v. Burlington N. R.R.*, 492 N.W.2d 399, 401 (Iowa 1992) (issues must be raised and decided by the district court before they may be raised and decided on appeal).

Third, SVILA is not seeking to include any property in the common areas designation that was not at issue in the district court. Sky View should have presented to the district court any attorney fees claim for defending Patten's title to these properties. Sky View would then have been in a position to raise the issue of appellate attorney fees. By failing to seek such fees in the district court, Sky View waived any right to claim appellate attorney fees.

Last, as mentioned, Sky View raised the appellate attorney fees and bad faith issues in its reply brief. Parties cannot assert an issue for the first time in a reply brief. *See Young v. Gregg*, 480 N.W.2d 75, 78 (Iowa 1992). When they do, this court will not consider the issue. *Ames v. Board of Supervisors*, 234 Iowa 617, 623, 12 N.W.2d 567, 570–71 (1944). We refuse to consider the appellate attorney fee and bad faith issues because they come too late.

### X. *Use of the Clubhouse.*

In its cross-appeal, SVILA complains because the district court awarded Sky View office space in the clubhouse.

As mentioned, in its original findings, the district court concluded Sky View was immediately obligated to convey the common areas to SVILA. The court further concluded SVILA's ownership rights would "be subject to Sky View's use, as provided in the relevant documents." Following the first ancillary hearing, the district court awarded Sky View use of office space in the clubhouse. In doing so, the court explained:

> By way of further clarification, the court found under the protective covenants and other relevant documents that even though the petitioner is entitled to ownership and is responsible for maintenance of the clubhouse, the defendant Sky View is entitled as the successor developer to use the common areas, and that explicitly includes the right to occupy a portion of the clubhouse for purposes of sales and further development of the area.

Because the documents did not specify what areas of the clubhouse were reserved for this purpose, the court looked to the history concerning the use of the clubhouse. Based on this history, the court set aside for Sky View's exclusive use two front offices.

The covenant document language pertaining to the common areas provides the following concerning the use of such areas:

> Prior to conveyance to the association, use of common areas shall be subject to reasonable rules and regulations promulgated by [the developer]. The use and enjoyment of common areas and improvements thereon, after conveyance to [SVILA] shall be subject to the powers of [SVILA] as set forth in its articles and by-laws and to such rules and regulations governing the use of such property and improvements as may from time to time be adopted by [SVILA]. *Provided, however, [the developer] reserves the right to use such common areas pursuant to said agreement between it and [SVILA].*

(Emphasis added.)

The italicized words clearly reserve to the developer the right to use the common areas. Sky View also has that right as Patten's successor.

Although the documents do not specify how and to what extent the developer can

use the clubhouse, we think the district court acted within the boundaries of its equity jurisdiction in making the office space award. *See Farmers Sav. Bank v. Gerhart,* 372 N.W.2d 238, 245 (Iowa 1985) ("Equity jurisdiction allows a court the necessary flexibility to determine the equities between the parties.").

We find that there was an adequate basis in the record for fashioning this remedy. Historically, Patten had used the clubhouse as a base of operations for its sales effort. At the time Patten sold its interest in the development to Sky View, the development consisted of over 600 platted and developed lots and approximately 160 acres of undeveloped land. We think it would be to all the parties' benefit to have a completed development. Without the clubhouse as a base of operations, there is a risk that Sky View might not be able to, or even want to, complete the development as originally contemplated.

### XI. *Disposition.*

We have considered all other issues raised. We find them without merit, unnecessary to discuss, or not raised in the district court. We affirm on Sky View's appeal. We also affirm on Patten's and SVILA's cross-appeals.

**AFFIRMED ON APPEAL; AFFIRMED ON CROSS–APPEALS.**