**IN THE COURT OF APPEALS OF IOWA**

No. 24-0576
Filed June 19, 2024

**IN THE INTEREST OF M.H.,**
**Minor Child,**

**S.H., Father,**
    Appellant.
_____

    Appeal from the Iowa District Court for Warren County, Mark F. Schlenker,

Judge.

    The father appeals the termination of his parental rights to his one-year-old

child. **AFFIRMED.**

    Zachary C. Priebe of Jeff Carter Law Offices, PC, Des Moines, for appellant

father.

    Brenna Bird, Attorney General, and Lisa Jeanes, Assistant Attorney

General, for appellee State.

    Magdalena Reese of Des Moines Juvenile Public Defender, Des Moines,

attorney and guardian ad litem for minor child.

    Considered by Tabor, P.J., and Greer and Schumacher, JJ.

**GREER, Judge.**

The juvenile court terminated the father's parental rights to M.H., born in September 2022, pursuant to Iowa Code section 232.116(1)(h) (2023).[1] The father appeals, arguing the State failed to prove the statutory ground because M.H. could be returned at the time of the termination trial or, alternatively, it would have been in M.H.'s best interests to establish a guardianship rather than terminate parental rights.

We review termination proceedings de novo. *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022). This means that while we respect the juvenile court's factual findings, especially on credibility issues, "we examine the whole record, find our own facts, and adjudicate rights anew on issues properly before us." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 629 (Iowa 1996).

The juvenile court terminated the father's parental rights under section 232.116(1)(h), which allows for termination when there is clear and convincing evidence:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

The father challenges only the fourth element—whether M.H. could be returned to his custody at the time of the termination trial. *See* Iowa Code § 232.116(1)(h)(4);

---

[1] The mother's parental rights were also terminated; she does not appeal.

*In re A.M.*, 843 N.W.2d 100, 111 (Iowa 2014) (interpretating "at the present time" to mean at the time of the termination trial).

In determining anew whether M.H. could have been returned to the father's custody at the time of the termination trial in January and February 2024, we review the relevant facts. The Iowa Department of Health and Human Services became involved shortly after M.H.'s birth, when it was discovered M.H. and the mother were living in a garage on a property in rural Iowa. The garage was not a safe place for M.H., and there were concerns the mother—who previously had her parental rights terminated to three other children—was using illegal substances and experiencing issues with her mental health. M.H. was removed from the mother's custody in September 2022; the mother reported to the department that the father was M.H.'s biological father, and paternity testing later confirmed it.[2]

While the father reported he was "clean and sober" to the department, based on his history of substance-use related convictions, the department asked the court to order the father to obtain both substance-use and mental-health evaluations and to submit to random drug testing. In its March 2023 permanency order, the court adopted the department's recommendations and concluded that the need for removal would no longer exist in six months.

The father began having supervised visits with M.H. in late January 2023. From the beginning, those visits the father attended went very well. While the father was not always consistent in attending the visits, when he did, he showed

---

[2] While it appears from the record that the father did not begin to receive supervised visits with M.H. until late January 2023, he was included in the legal proceedings from the beginning, starting with the original notice of hearing and summons filed in September 2022.

he was able to provide the necessary care for M.H., appropriately interact with her, and keep her safe.[3] Still, early on in the case, the father did not have a driver's license or stable housing he would give the department the address of, and he did not provide any of the food or items (like diapers) that M.H. required during visits. The father also failed to complete drug testing when asked and did not follow through with obtaining a mental-health or substance-use evaluation. Additionally, the father continued to have run-ins with the mother, who was not participating in the case, although the father was the named protected party in a no-contact order with the mother.

By May, the father paid off his fines and got his driver's license. And by July, he began bringing his own diaper bag to visits. As of September, he had a stable residence, which the department approved for visits with M.H. But at the October permanency hearing, the juvenile court concluded M.H. could not be returned to the father because he had failed to submit to any requested drug screens and had yet to complete a substance-use evaluation.

At the time of the termination trial in early 2024, questions about the father's ability to otherwise protect and provide M.H. with a safe home persisted. The fully supervised visits continued to go well, and the father was often commended for his parenting during those interactions in the visitation reports. But the father's initial

---

[3] The provider reports from the family support specialist who supervised visits noted multiple visits where the father fell asleep while sitting with a sleeping M.H. The provider did not seem to find this to be a safety concern, allowing it to repeatedly happen without waking the father up. But in a later report to the court, the social work case manager pointed to these incidents (combined with the fact the father failed to submit to drug testing) as evidence the father was using illegal substances.

reports of being "clean and sober" turned out to be false—when he finally completed his substance-use evaluation, he reported using marijuana. And at the termination trial, the father admitted to near daily use of the drug. Because the father failed to submit to all six of the drug screens that were requested of him, it is unknown whether the father's self-reporting that his last use of methamphetamine, cocaine, and LSD were all multiple years in the past was accurate.

The father also changed his tune about the mother—who was not engaged in the child-welfare case, who seemed to be continuing to use illegal substances (such as methamphetamine), and whom the father had a no-contact order against for most of the case. While the father stressed that he and the mother were not a "package deal" and that he would keep the mother away from M.H. if the child was in his care, his continued association with the mother and later actions raised questions. There were several instances throughout the pendency of the case where the father and mother were caught together—including times where the father was choosing to drive the mother somewhere. The police report from one incident in May 2023 quoted the mother as telling the officers who stopped the vehicle that she saw the father throw methamphetamine, marijuana, and a pipe out the window before the officers made the stop. After he moved into his home, the father was asked if the mother was living with him, and he denied it, reporting she had never been there. But a couple weeks later, while a supervised visit was taking place at the home, the mother entered and took food from the kitchen, with no response from the father. And—according to a January 2024 report to the court filed by the department case manager—the father's landlord believed the mother

was living at the father's home. Additionally, the father chose to have the no-contact order dropped in December 2023. Yet at the termination trial in early 2024, the father bemoaned the mother's repeated entry into his property, admitting "she comes whenever she feels like it" but claiming he wanted to keep her out. At the same time, when asked how he would keep her out of the home if M.H. was returned to him, the father responded, "Well, I'm going to do my best, but I also ain't going to keep her away from him either because that is his mom." The father clarified that he would not let the mother be around M.H. when she is high.

We recognize that the father exhibited good parenting skills during fully supervised visits. But because of the questions that still existed approximately sixteen months after M.H.'s removal from parental custody about the father's sobriety and his ability to keep M.H. safe from the mother, like the juvenile court, we cannot say that M.H. could be safely returned to the father's custody at the time of the termination trial. Therefore, the State proved the ground for termination under section 232.116(1)(h).

Next, the father argues it is in M.H.'s best interests to establish a guardianship for M.H. in lieu of terminating the father's parental rights. *See* Iowa Code § 232.104(2)(d)(2) (allowing the court to transfer guardianship and custody of the child to a suitable person), (4)(a) (allowing the court to establish a guardianship under section 232.104(2)(d)(2) so long as "termination of the parent-child relationship would not be in the best interest of the child"). While the juvenile court seemed to conclude that a guardianship was not appropriate here, we have not found in the record where a guardianship was requested or a possible guardian named. Without a named option and evidence supporting the choice of a particular

person, we cannot review the factors that are usually considered when determining whether a guardianship is appropriate in this case. *See, e.g.*, *In re A.S.*, 906 N.W.2d 467, 478 (Iowa 2018) (noting "there was physical and verbal aggression" in the relationship between the parent and potential guardian when concluding termination was in the child's best interests); *In re O.L*, No. 23-1109, 2023 WL 6290677, at *3 (Iowa Ct. App. Sept. 27, 2023) (affirming juvenile court's decision to not order a guardianship when the department had "questions about the great-grandmother's ability or willingness to set appropriate boundaries when it comes to the father and the children" and when the great-grandmother did not testify and was not asked whether she was willing to be the children's guardian instead of adopt). With the record we have before us, we cannot say the juvenile court should have established a guardianship in lieu of termination.

We affirm the termination of the father's parental rights.

**AFFIRMED.**