**IN THE COURT OF APPEALS OF IOWA**

No. 15-0921
Filed December 23, 2015

**SARAH BETH SLOAN,**
        Plaintiff-Appellant,

**vs.**

**COURTNEY ARTHUR CASEY,**
        Defendant-Appellee.
_____


        Appeal from the Iowa District Court for Polk County, Mary Pat Gunderson,

Judge.


        Sarah Sloan appeals from a decree modifying custody and support

concerning the parties' minor child.  **AFFIRMED.**



        Jeffrey A. Kelso of Cunningham & Kelso, P.L.L.C., Urbandale, for

appellant.

        James R. Quilty of Quilty Law Firm, Des Moines, for appellee.



        Heard by Potterfield, P.J., and Doyle and Tabor, JJ.

**POTTERFIELD, Presiding Judge.**

Sarah Sloan appeals from a decree modifying custody and support concerning the parties' minor child. Upon our de novo review, we conclude there has been a substantial change of circumstances. We affirm the order modifying physical care with fewer parental exchanges and giving Courtney Casey the primary authority to make the child's non-emergency medical appointments.

**I. Background Facts and Proceedings.**

Sarah Sloan and Courtney Casey have never been married. They had a child together, J.C., who was born in 2004. A decree establishing paternity, custody, visitation, and child support was entered on October 26, 2005. The parties were granted joint legal custody and the child was placed in Sarah's physical care. Courtney's parenting time was set for overnight every Wednesday, every other weekend, and every other Monday evening following the weekend he did not have the child. In June 2012, Courtney and Sarah filed cross-applications to modify the decree. In September 2012, the child was diagnosed with celiac disease. The modification applications were voluntarily dismissed on November 8, 2012. In December 2012, the child was diagnosed with Type 1 diabetes.

On December 4, 2013, a department of human services (DHS) child protective assessment was conducted concerning a report that Courtney was not providing adequate care to the child. The report was not confirmed. The child protective worker (CPW), Lauren Templeman, observed:

> It appears each parent has a different understanding and feeling to the importance with regards to cross contamination and the impact on her gluten levels and celiac disease. In consultation

with the specialist's office, this worker is highly recommending that Courtney, his wife, and [J.C], together attend an educational session with a nutritionist. . . .

[J.C.] should continue to attend therapy with Bridget Beneke. Both parents need to regularly attend sessions with [J.C.] per the recommendation of the therapist. This worker has again recommended that they work with in-home services now called [Behavioral Health Intervention Services] BHIS through title 19 as referred by Ms. Beneke. She can set that up to help with communication between the households. This is the service you participated in the past with [Children and Families of Iowa] CFI that came to your home.

. . . .

This child stays in two very different households. The negative speaking of one parent is not harming the other parents, it is harming the child. The other parent is half of this child and it is not just an insult to the other parent but an insult to the child.

This worker has seen, in the prior assessment by this worker, the last assessment by CPW Hansen, and through this assessment, how the two households are run at polar opposites. This worker has seen that Sarah appears to be structure-oriented around her daughter's diagnosis. She stated that [J.C.]'s issues are caused by, or contributed by, Courtney or Carly.

This worker feels that Courtney wants to have a household that [J.C.]'s diagnoses are in the background. He states he wants her to be a normal kid. A concern is how much is it in the background that [J.C.] is concerned if he keeps her safe medically.

[J.C.] has been parented by, and her train of thought regarding her diagnosis has been from primarily her mother. She is naturally hyperactive with regard to her diet and blood sugars. It appears [J.C.] is concerned she cannot tell her dad when she has fears about this. While [J.C.] should be vigilant in her own care, there is a concern that her mother takes it to a new level of concern and this does not allow her to have time to just be a kid. This is while the father's household puts it too far into the background.

[J.C.] is nine years old and is privy to too much information. Neither way of parenting is exactly right nor is the other way abusive in nature at this point in time. This worker's concern is if the opposite parenting styles do not come together at least some, this could lead to continuing mental concerns for [J.C.] This needs to be addressed in therapy. If it continues and shows to impair her ability to function in life, DHS could be contacted regarding a referral for mental harm.

On March 19, 2014, Courtney again filed an application to modify custody, asserting, among other things, that Sarah was now disabled and unemployed,

did not support his relationship with the child, and was imposing mental and physical abuse upon the child by subjecting the child to unnecessary and intrusive medical care.

Sarah filed a cross-application to modify, requesting a change in the visitation schedule and sole legal custody.

On May 15, 2014, the court appointed Amy Skogerson to serve as guardian ad litem (GAL) for the child and ordered the GAL to make specific recommendations regarding a parenting schedule for the minor child and to draft a proposed parenting plan for the parties. Additionally, the court ordered the GAL to prepare a written report detailing her recommendations. On September 9, 2014, the GAL submitted her report and recommendations to the district court. She recommended "some kind of limitation" on Sarah's medical powers, increased parenting time for Courtney ("grant him care of J.C. at least 50% of the time"), and that parenting time be "divided into large blocks of time without frequent exchanges." The GAL also opined Sarah "may benefit from obtaining a mental health evaluation and following through with any recommended treatment to help her cope with stress, anxiety, post-traumatic stress and/or any other concerns identified." Finally, the GAL suggested the appointment of a parenting coordinator.

The GAL offered testimony at the March 2015 trial in which she explained the findings in her report. The GAL pointed out what she believed to be each parent's strengths and weaknesses and her concerns for the child. She stressed the importance of modifying the visitation schedule to allow for more consistency and stability for the child. In her opinion, the current schedule was not in the best

interest of the child as it required too much moving between homes throughout the week.

The following facts found by the district court are fully supported by the record:

> Sarah is 32 years old and is generally in good physical health. She states she suffers from hypothyroidism and fibromyalgia and is currently taking medicine for each of these medical conditions. In the past she has received treatment for depression, anxiety, and post-traumatic stress disorder and has been treated with medications for these conditions. She discontinued all counseling and medications for her mental health issues sometime in 2011 or 2012. At trial she stated that she does see a therapist but not on a regular basis.
>
> She completed high school and attended . . . Vatterott College. She has a . . . boyfriend, Grimaldo Hernandez, with whom she has two children, both of whom are younger than J.C. Grimaldo Hernandez is gone every week during the week and returns home to spend the [occasional] weekend with Sarah and their two biological children. Sarah is currently unemployed.
>
> Courtney is 34 years old and is in good physical health with the exception of some back pain issues. He admitted to having a prior addiction to prescription pain medication due to his back pain; however, he successfully completed substance abuse treatment in 2009 and has had no relapses since completion of that program. Courtney is employed full time in a family business, Rubber Roofing Systems, Incorporated. He lives with his wife, Carly, and they have a son who is significantly younger than J.C. Carly also has a daughter from a prior relationship, and she is slightly older than J.C. When J.C. spends time with Courtney, she shares a bedroom with Carly's daughter.
>
> J.C. is an active 11-year-old girl in fifth grade at St. Teresa's Catholic School. She participates in dance, gymnastics, swimming and basketball. She is a good student in spite of missing a significant amount of school. She is well liked by her classmates and has lots of friends.
>
> In September 2012, J.C. was diagnosed with celiac disease and in December of that same year was diagnosed with Type 1 Juvenile Diabetes. These diagnoses required significant changes to her diet and lifestyle. J.C.'s diabetes requires a strict dietary regimen in addition to her gluten-free diet. J.C. has taken on the responsibility of managing her diet and her diseases. The proficiency with which she manages her diseases was undisputed.

Although J.C. is managing her celiac disease and juvenile diabetes well, she suffers from some incontinence. The incontinence began recently; years after she had been successfully potty-trained. She has undergone significant medical testing for her incontinence and no anatomical or neurological basis for J.C.'s incontinence has been determined. After hearing the testimony, it appears the incontinence began at approximately the same time Sarah made . . . allegations that Courtney was sexually abusing J.C. These allegations were investigated by the Department of Human Services and were unfounded.

The current relationship between the parties is seriously fractured. Courtney and Sarah have a history of criminal harassment and protective orders. In 2007, Courtney sought and obtained two temporary protective orders prohibiting Sarah from having contact with him. In 2008, Courtney pled guilty to harassment in the 3rd degree and a criminal no-contact order was entered prohibiting him from contacting Sarah. Due to the tumultuous relationship between the parties, all visitation exchanges occur at the Des Moines police department.

The Court heard much testimony and reviewed numerous exhibits over the course of the three-day modification trial. However, the most disturbing evidence was that which pertained to the number of medical procedures, exams, and appointments J.C. has undergone. In fairness, this child does suffer from two serious diseases; celiac disease and juvenile diabetes. Both of these diseases require treatment and care. They also require a vigilance surrounding diet and medication. By all accounts, both parents are rigorous in their food preparation including keeping separate cookware at each home so as to not contaminate any of J.C.'s food with gluten. The testimony reflected that Courtney was slow to respond to J.C.'s dietary changes and was not always as diligent as is required when managing these diseases. But, over the past year Courtney has undergone significant training and education on juvenile diabetes and by all accounts is providing all necessary support and care to J.C. as she learns to live with these diseases. Additionally, J.C. has taken on much of the responsibility for managing her diet and medication.

Yet, even considering the juvenile diabetes and celiac disease, the Court was stunned to learn that over the past four years J.C. has been to some type of medical care giver or therapist for an appointment, a test, or an exam somewhere between 285 and 400 times. The Court received into evidence hundreds of pages of medical reports regarding this child. During the 2013–14 school year alone, J.C. missed 40 partial or full days of school for various medical appointments or alleged illnesses. An example of the physical exams and medical tests this child has undergone include but are not limited to: drug screen (negative), lead exposure

testing (negative), two sexual assault exams (both negative), an echocardiogram (negative), urinary tract infection appointments (majority negative), [and] numerous emergency room visits at both Mercy and Methodist Hospitals. J.C. has also undergone a high resolution anorectal man[o]metry study which required sedation. The results were normal. All of these exams were requested by Sarah after describing her observations of J.C. to various medical providers.

In addition to the extraordinary numbers of medical procedures this child has been subjected to, Sarah has [instigated] numerous . . . allegations to the Department of Human Services regarding Courtney.

In May 2007, Sarah contacted the Iowa Department of Human Services and reported illegal drug usage in Courtney's home, including marijuana and methamphetamine. An investigation occurred per Sarah's request. As a result, J.C. was subjected to a full drug screen; which was negative. The DHS report was unfounded.

In March 2011, Sarah made statements to medical personnel alleging that Courtney had sexually abused J.C. A DHS investigation ensued, in which J.C. denied any inappropriate touching by her dad. As part of the investigation, J.C. was subjected to a sexual assault exam. No signs of sexual abuse were found. The report was unfounded.

Despite the negative findings by the Department of Human Services, Sarah continued to tell J.C.'s service providers about her suspicion of sexual abuse by Courtney. Between approximately May 2007 and December 2013, seven or eight DHS investigations of alleged abuse or neglect against Courtney occurred. Each of the DHS assessments resulted in a finding of "not confirmed." In a May 2012 report prepared by DHS worker Lauren Templeman she noted her concerns:

> This worker believes there are many concerns with the continued pursuit of hampering the relationship of the child with her father and pursuit of the beliefs of sexual abuse with no physical evidence, nor statements made by the child. This appears to be causing disruption in the child's life and her daily functioning. If this continues, it is recommended the Department of Human Services do further investigation of the child.

Eight days after the May 2012 sexual abuse investigation was concluded and was unconfirmed, Sarah took J.C. to the doctor for alleged vaginal bleeding and painful urination. J.C. was given another sexual assault exam that yielded no results.

Many of these investigations involved personal interviews with J.C. requiring her to answer difficult invasive questions as well

as her being subjected to two sexual assault exams and drug screen testing. A child does not experience this type of relentless emotional and physical poking and prodding without some type of emotional and or psychological scarring. The Court notes it was during this time that J.C. started having incontinence issues.

On March 5, 2015, the district court determined there had been a substantial change in circumstances, not contemplated by the court when the decree was entered in 2005. The court found:

> Specifically, J.C. has been diagnosed with both celiac and juvenile diabetes. Additionally, Sarah has subjected her daughter to numerous unnecessary, unwarranted and painful medical procedures. This has resulted in J.C. missing significant amounts of school. Finally, the Court finds Sarah has interfered with Courtney's relationship with J.C. based on unfounded DHS reports resulting in unfounded DHS investigations. The court finds modification of the decree entered on October 26, 2005, is warranted.

The court modified legal custody to the extent that Courtney "shall be the sole parent to schedule all routine medical appointments for J.C." Sarah was not precluded from scheduling emergency care for J.C. But, "[p]rior to Sarah taking J.C. to a provider for emergency care or in the process of doing so, she shall attempt to reach Courtney by all reasonable means to advise him of the basis for the emergency care."

The district court ordered the child placed in Courtney's physical care and ordered that each parent would have the child on a "seven on and seven off schedule." The child was to continue to attend mental health and behavioral health intervention services (BHIS). Sarah was ordered to obtain a mental health evaluation and follow through with any recommended treatment. The court also entered a holiday schedule, ordered the appointment of a parenting coordinator, and ordered Sarah to pay child support in the sum of thirty dollars per month.

Sarah appeals, contending the district court erred in ruling a change of circumstances was warranted because the court did not find Courtney could provide superior care. She also contends the court erred in removing her ability to make medical decisions, ordering her to obtain a mental health evaluation, and modifying the parenting time schedule.

## II. Scope and Standard of Review.

Our review of child custody proceedings is de novo. *In re Marriage of Hansen*, 733 N.W.2d 683, 690 (Iowa 2007). "We give weight to the findings of the district court; especially to the extent credibility determinations are involved." *Id.*

## III. Discussion.

A. *Modification of physical care.* Sarah maintains the court erred in (1) ruling a change of circumstances warranted a change of physical care, (2) modifying physical care without finding Courtney could provide superior care, and (3) modifying the parenting time schedule. We address these claims together.

A party requesting modification must prove (1) a substantial and material change in circumstances that is more or less permanent and affects the child's welfare and (2) an ability to provide superior care. *In re Marriage of Frederici*, 338 N.W.2d 156, 158 (Iowa 1983). On our de novo review, we are convinced Courtney satisfied this heavy burden.

While we recognize Sarah loves her daughter, we also must recognize that since at least December 2013, DHS workers have expressed concern about her repeated allegations that Courtney mistreats the child in various ways,

despite findings to the contrary. The GAL shared this concern "of ongoing statements by Sarah about Courtney to nearly every medical, mental health and social work professional with whom Sarah has come into contact." The GAL observed, "J.C.'s records are riddled with statements by Sarah about Courtney and his allegedly abusive and/or neglectful parenting of J.C." The GAL also expressed concern about "Sarah's level of medical attention with J.C." She noted "questionable visits and procedures" and Sarah "continuing to seek medical attention and invasive testing for J.C. that may not actually be necessary." The GAL noted there had been seven to eight DHS investigations of alleged abuse or neglect by Courtney conducted and "every single DHS assessment results in a finding of 'not confirmed.'" We conclude Sarah's repeated charges against Courtney, which have resulted in the child repeatedly having to endure invasive questioning and medical testing, constitutes a material and substantial change of circumstances affecting the welfare of the child. *See In re Marriage of Winnike*, 497 N.W.2d 170, 174 (Iowa Ct. App. 1992) ("In determining custody we can give great weight to a parent's attempt to alienate a child from her other parent if evidence establishes the actions will adversely affect a minor child."); *see also*, *e.g.*, *In re Marriage of Gooley*, No. 08-0551, 2008 WL 5412287, at *3 (Iowa Ct. App. Dec. 31, 2008) (affirming modification of physical care where mother "systematically attempted to destroy the relationship between father and daughter" by making "numerous allegations of abuse to the DHS," subjecting child "to at least four genital examinations . . . with none finding there was conclusive evidence of sexual abuse," and taking other actions against the best interests of the child).

Sarah argues the district court did not find Courtney could provide superior care. While the district court did not make that explicit finding, upon our de novo review, we conclude Courtney can provide superior care. Sarah argues she is more "in tune" with the child's diabetes and celiac nutritional needs. However, the problem appears to be that Sarah is overly so. On the other hand, Courtney has attempted to take the focus off the child's health conditions. We acknowledge Courtney may have been somewhat less than vigilant when the child was first diagnosed. However, he and his wife have since become "completely involved in J.C.'s diabetic care" and are cognizant of and act in accordance with her dietary needs. Moreover, Courtney assured the court he is in favor of continuing J.C.'s mental health and behavioral counseling. We thus conclude Courtney has proved he can offer J.C. superior care, notwithstanding Sarah's historic role as primary caretaker.

The district court's modification of physical care places the child with each parent for a week at a time. That schedule maximizes the child's time with each parent, and minimizes parental exchanges and the stress those exchanges cause for the child. The schedule is consistent with the GAL's recommendations. We affirm.

*B. Modification of legal custody.* "'Legal custody' or 'custody' means an award of the rights of legal custody of a minor child to a parent under which a parent has legal custodial rights and responsibilities toward the child." Iowa Code § 598.1(5) (2013). In the original decree, Sarah and Courtney had joint legal custody, that is, the right to "equal participation in decisions affecting the

child's legal status, medical care, education, extracurricular activities, and religious instruction." *Id.* § 598.1(3).

Both parties sought a modification of legal custody. Courtney requested sole legal custody so he would be "the party responsible for managing [J.C.'s] health care issues so she is not subjected to excessive medical examinations." In response, Sarah asked that she "be solely designated to make health care decision for the minor child." Based on its finding that "Sarah has subjected her daughter to numerous unnecessary, unwarranted and painful medical procedures," which "has resulted in J.C. missing significant amounts of school," the district court struck a different balance:

> 1. Joint Legal Custody—It is in J.C.'s best interests that the parents continue to have joint legal custody subject to some modification. Specifically, the Court orders that while the parties shall have essentially all of the rights associated with Joint Legal Custody, *Courtney shall be the sole parent to schedule all routine medical appointments for J.C.* Sarah is neither precluded from scheduling emergency care for J.C. nor precluded from attending any routine care appointments scheduled for J.C. by Courtney. Prior to Sarah taking J.C. to a provider for emergency care or in the process of doing so, she shall attempt to reach Courtney by all reasonable means to advise him of the basis for the emergency care.

(Emphasis added.)

The provision is consistent with the GAL's recommendation that some limitation be placed on Sarah's medical authority. Sarah is not deprived of providing necessary care for the child. Upon our de novo review, we find no reason to disturb this provision of the modified decree. *See Harder v. Anderson, Arnold, Dickey, Jensen, Gullickson & Sanger, L.L.P.*, 764 N.W.2d 534, 538 (Iowa 2009) (noting a parent's rights are "tempered by the overriding principle that

when dealing with a matter concerning a child whose custody was determined by court decree . . . , the first and governing consideration a court must apply is the best interest of the child").

*C. Mental health evaluation.* On appeal, Sarah contends the court's order that she undergo a mental health evaluation is duplicative and unnecessary because she testified she sees a therapist.[1]

In the past, Sarah has received treatment for depression, anxiety, and post-traumatic stress disorder and has been treated with medications for these conditions. However, she discontinued all counseling and medications for her mental health issues sometime in 2011 or 2012. The GAL testified a hospital social worker raised a concern that the child's extensive medical records across multiple health systems suggest the mother may have a mental health issue underlying her hypervigilance concerning the child's health. Sarah's testimony that she occasionally sees a counselor does not negate the assistance a mental health evaluation could provide or the benefit to the child of the requirement that Sarah follow the recommendations of the mental health evaluation.

We affirm the district court's modification of the physical care provision in the paternity, custody, visitation, and support decree.

**AFFIRMED.**

---

[1] In her reply brief, Sarah contends the court was without authority to order such an examination. However, because this claim was not made to the district court and is raised for the first time in a reply brief, it is not properly before us. *See State v. Olsen*, 794 N.W.2d 285, 287 n.1 (Iowa 2009) ("Because Olsen failed to raise this issue in his original brief, the issue is not preserved for our review."); *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 642 (Iowa 1996) ("Parties cannot assert an issue for the first time in a reply brief. When they do, this court will not consider the issue.").