# IN THE COURT OF APPEALS OF IOWA

No. 19-1431
Filed April 29, 2020

**IN THE INTEREST OF K.C.,**
**Minor Child,**

**H.M., Mother,**
    Petitioner-Appellee,

**K.R.C., Father,**
    Respondent-Appellant.

_____

Appeal from the Iowa District Court for Floyd County, Karen Kaufman Salic, District Associate Judge.

A father appeals the termination of his parental rights in a proceeding brought under Iowa Code chapter 600A. **AFFIRMED**.

Judith O'Donohoe of Elwood, O'Donohoe, Braun, White, LLP, Charles City, for appellant father.

Ann M. Troge, Charles City, for appellee mother.

Marilyn Dettmer of Dettmer Law Firm, Charles City, attorney and guardian ad litem for minor child.

Considered by Bower, C.J., and Greer and Ahlers, JJ.

**AHLERS, Judge.**

The father of the child appeals from the juvenile court's order terminating his parental rights under Iowa Code chapter 600A (2019). His primary arguments relate to challenges to the juvenile court's findings that the mother proved abandonment and it was in the best interest of the child to terminate his rights. He also claims it was error for the juvenile court to consider the guardian ad litem's report to the court and to deny his request to leave the record open so he could depose a witness and submit the transcript of that deposition. Finding no error, we affirm.

## I.      Standard of Review.

We review termination proceedings under chapter 600A de novo. *See In re R.K.B.*, 572 N.W.2d 600, 601 (Iowa 1998). As in all termination proceedings, our primary concern is the child's best interest. *See* Iowa Code § 600A.1; *R.K.B.*, 572 N.W.2d at 601. Though the juvenile court's fact findings are not binding, we give them weight. *See R.K.B.*, 572 N.W.2d at 601. This is especially true with regard to credibility findings. *See id.*

## II.     Background Facts and Proceedings.

In terms of background facts, we start by noting the juvenile court issued a thorough and detailed ruling setting forth factual findings and legal conclusions. Upon our de novo review, we are in substantial agreement with all significant factual findings made by the juvenile court. We will attempt to highlight some of the most significant details.

The father was in the United States Air Force stationed in Wyoming and married to the mother when the child was born in 2005. For the first eighteen

months of the child's life, both parents were extensively involved in caring for the child in Wyoming. In the spring of 2007, due to marital difficulties, the mother and the child moved to California where the mother's parents lived. The mother filed for divorce in California, and the marriage was dissolved in December 2007. The divorce decree gave the mother custody of the child, left visitation up to the agreement of the parties, and ordered the father to pay child support. Until the termination hearing, the last time the father saw the child in person was while the divorce was pending in 2007. For the next two years after the divorce, the father maintained some communication with the child through the mother and would send Christmas and birthday gifts. This ended in the fall of 2009 after the father, while speaking to the child on the phone, heard the child refer to the mother's boyfriend (now husband) as "daddy." Thereafter, the father's contact with the child and the mother became largely nonexistent. However, the mother kept the father continually apprised of her whereabouts, phone number, and email address as the mother, her husband, and the child moved to the state of Washington and then Iowa.

The mother and father eventually remarried others and each had a son with their respective new spouses. The father claims that in 2011 he had a conversation with the mother in which they agreed that, to avoid confusing the child, they would wait until the child was ten years old and then have a conversation explaining who the father was, since the child's stepfather was the only father of whom she had memory. The mother denies such an agreement. Regardless of whether such an agreement was reached, based on his claimed belief there was

such an agreement, the father made essentially no effort to have any contact or relationship with the child for the next several years.

During the period from approximately 2011 to 2015, the father was stationed or deployed at various locations in Germany, Turkey, Africa, and England.  During this time, he claims his military duties prevented him from having the opportunity to call, write to, Skype with, or send a card or gift to the child.  He uses this claim, along with the claimed agreement to wait until the child was ten before introducing himself to her, as a reason for why he made no effort to contact the child in any meaningful way during this time.  We share the juvenile court's skepticism that the father's military duties completely prevented him from doing any of those things.  While we acknowledge the fact the father's military service severely restricted his ability to physically visit the child as well as his ability to routinely communicate with the child in other ways due to deployments in areas with limited internet access or ability to make telephone calls, we are not persuaded such military service prevented all telephone, email, and mail communication options for years on end.

The conclusion the father's military service did not prevent all communication is bolstered by the events surrounding the father's son with his second wife.  During this same time period when he was making no discernible effort to have any type of relationship with the child in this case, the father was divorced from his second wife, with whom he had a son, and married his third wife, with whom the father lived in England.  It came to the father's attention that the son's mother had severe drug problems that had resulted in the son being removed from his mother's care.  The father managed to arrange leave and transportation

back to Pennsylvania to fight court battles there that ultimately resulted in the father gaining custody of his son, having the son's mother's parental rights terminated, and having the son move to England to live with the father and his current wife. While we understand the fact the father was able to gain such leave based on the emergency nature of the proceedings, we find it telling that the father could manage to obtain leave and return to the United States to address the son's issues, but he could not manage to make a telephone call, send an email, or send a letter to the child in this case. He also made no effort to arrange to see the child while he was back in the United States.

Sometime between 2012 and 2015, the mother and the father began to communicate about the child. Contrary to the father's hope such communication would center around reintroducing him into the child's life, as the father expected based on his purported belief there was an agreement to do so, the mother focused those conversations on requesting the father's consent to termination of his parental rights. The father ultimately refused to consent. In doing so, he continually acknowledged the mother and the stepfather were serving as the parent figures for the child and he had no interest in disrupting that relationship. He merely wanted to be able to talk to the child. The mother highlighted the inducement that terminating his parental rights would end his child support obligation, which the father had been satisfying fully throughout the child's life, but this did not persuade the father to consent.

In approximately 2017, the father returned to the United States, moving to Texas with his current wife, his son (who had been adopted by his current wife), and the current wife's daughter. He left the military in 2018. Even upon return to

the United States, the father made no discernible effort to communicate with or see the child. His stated reason for this was he did not want to disrupt the child's relationship with the mother and stepfather, and, given the mother's continual request for his consent to termination of his parental rights, he feared reaching out would cause the mother to start termination proceedings. To some degree, his fear was warranted. In March 2019, the child, who was thirteen years old at the time and had recently been given her first cell phone, tracked the father down on Facebook and initiated a messaging conversation with him. Both the father and the child seemed to enjoy the interaction. When the child shared this information with the mother, the mother began crying. Credibly claiming she did not want the child on Facebook at such a young age, the mother blocked the child's access to Facebook entirely, not just access to the father. When the mother informed the father of this fact, the father did not disagree with the mother's decision to block the child's access to Facebook, but he requested an alternative method of contacting the child. The mother did not provide an alternative method. Instead, she filed this termination proceeding.

**III.    Discussion.**

**A.    Statutory Grounds**.

The petition seeking termination of the father's parental rights alleged grounds of abandonment pursuant to Iowa Code section 600A.8(3)(b).[1]  One of

---

[1] Iowa Code section 600A.8(3)(b) sets forth following ground for termination:
    If the child is six months of age or older when the termination hearing
    is held, a parent is deemed to have abandoned the child unless the
    parent maintains substantial and continuous or repeated contact with
    the child as demonstrated by contribution toward support of the child

the challenges to the father and the court in a case such as this is overcoming the mental hurdle of the use of the term "abandoned." That term has inherent negative connotations of very broad scope. *See Abandon, Black's Law Dictionary* (11th ed. 2019) (defining "abandon" as "[t]o cease having (an idea, attitude, or belief); to give over or surrender utterly."). The father can naturally ask how he can be found to have abandoned the child when he was fulfilling half of the parenting duties for the first eighteen months of the child's life, paid the agreed amount of child support faithfully for twelve years after the parents ended their marriage, maintained an interest in the child, and knew the child was in good hands in a known location. This situation would not be what many people think of when they envision a parent "abandoning" a child. However, abandonment in the context of this proceeding is a term defined by statute. The statutory definition is much more limited in scope than a common understanding of the concept of abandonment. Under the statute, in addition to providing for the child's financial support, a parent must also maintain

---

of a reasonable amount, according to the parent's means, and as demonstrated by any of the following:

(1) Visiting the child at least monthly when physically and financially able to do so and when not prevented from doing so by the person having lawful custody of the child.

(2) Regular communication with the child or with the person having the care or custody of the child, when physically and financially unable to visit the child or when prevented from visiting the child by the person having lawful custody of the child.

(3) Openly living with the child for a period of six months within the one-year period immediately preceding the termination of parental rights hearing and during that period openly holding himself or herself out to be the parent of the child.

The phrase "to abandon a minor child" means a parent "rejects the duties imposed by the parent-child relationship . . . which may be evinced by the person, while being able to do so, making no provision or making only a marginal effort to provide for the support of the child or to communicate with the child." Iowa Code § 600A.2(20).

substantial and continuous or repeated contact with the child in the manner described in section 600A.8(3)(b)(1)-(3). If the parent does not act as described, the "parent is deemed to have abandoned the child." Iowa Code § 600A.8(3)(b); *see also*, *e.g.*, *In re W.W.*, 826 N.W.2d 706, 710-11 (Iowa Ct. App. 2012) (finding a mother abandoned her children after she did not see, communicate with, or financially support them for seven years); *In re G.A.*, 826 N.W.2d 125, 129-30 (Iowa Ct. App. 2012) (finding a father abandoned his child—who was almost five years old when the mother filed the petition—after he did not have or request contact with the child in more than one year); *In re C.A.V.*, 787 N.W.2d 96, 101-02 (Iowa Ct. App. 2010) (finding a father abandoned his child after he had no contact with the child for three years, even though he had repeated contact during the child's first thirteen months of life and he was current on his child support obligations at the time of the hearing).

In this case, there is no question the father fulfilled his financial support obligations, as he paid all agreed-upon support obligations in a timely manner. However, under the statute, financial support alone is not enough. *See C.A.V.*, 787 N.W.2d at 102 ("[The father's] contributions to his child's financial well-being do not overcome his complete abstention from fostering her physical, social, and emotional development."). In this case, the father did not meet his obligations for maintaining substantial and continuous or repeated contact with the child. The evidence clearly and convincingly established the father did not visit the child monthly, did not maintain regular communication with the child or the mother, and did not openly live with the child for a period of six months within the one-year

period immediately preceding the termination hearing. *See* Iowa Code § 600A.8(3)(b)(1)-(3).

The lack of communication and contact by the father was not caused by efforts by the mother to prevent such communication or contact. The father simply did not try. We are mindful of the fact the father's military duties made communication more challenging than for a non-military person, and the father's military assignments may have resulted in there being months when he could not have maintained contact. He could and would be excused for those periods of time. However, the father's military duties did not prevent him from all communication and contact for the nearly twelve-year period during which the father had little to no contact with the child or the mother about the child. We, like the juvenile court, find it unlikely to the point of unbelievable that the father was unable to send letters, cards, gifts, or emails or make periodic phone calls for twelve years. In his brief, the father attempts to blame the mother for the lack of contact. These claims are not supported by the record. The father's brief implies the father was powerless and helpless to forge a relationship with the child, while the record demonstrates the father made no meaningful effort. Even by the father's own admissions, when the child was approximately three to five years old, he agreed to take a hiatus until the child was ten before being "introduced" to her. He claims the agreement for him to be reintroduced at age ten was breached when the mother began pestering him to consent to termination of his parental rights. Besides the fact the mother denies there was any such agreement, the fact the father voluntarily agreed to have no communication with or about the child for five to seven years demonstrates abandonment as contemplated by the statute. Even

after the father discovered the breach of the alleged agreement, the father still took no action to reinitiate contact with the child in any significant way. Under the circumstances of this case, we find no error in the juvenile court's determination that the statutory grounds for abandonment were established by clear and convincing proof. *See id.*

## B. Best Interest of the Child.

Finding the statutory grounds for termination of parental rights have been met does not end the discussion, however, as private termination proceedings under Iowa Code chapter 600A involve a two-step process. *In re B.H.A.*, 938 N.W.2d 227, 232 (Iowa 2020). In addition to proving grounds for termination, the filing party must prove by clear and convincing evidence that termination is in the best interest of the child. *Id.*

The father cites *In re Q.G.*, 911 N.W.2d 761 (Iowa 2018), in support of his argument it is not in the child's best interest to terminate his parental rights. It is understandable the father cites *Q.G.*, as the father in that case engaged in horrible parenting. The father in *Q.G.* had been a methamphetamine abuser, physically assaulted his wife (the mother of the children at issue) on two occasions, and endangered one of the children during one of the physical assaults. 911 N.W.2d at 762-65. He also possessed an illegal fully-automatic rifle and was attempting to make illegal silencers for one or more firearms. *Id.* At the time of the termination hearing, he was in prison on state charges of domestic abuse assault, child endangerment, and possession of methamphetamine and also on federal charges of possession of a firearm while unlawfully using a controlled substance. *Id.* In the time before and after entering prison, the father blamed the mother for his

situation and threatened revenge. *Id.* at 765-66. In spite of all that, the father and the mother entered a stipulation in their dissolution of marriage proceedings a few months before the termination-of-parental-rights proceedings were started in which the parties agreed to the father's visitation and contemplated modification of that visitation once he was released from prison. *Id.* at 767. In the meantime, the mother started a relationship with another man who the children referred to as "daddy" and who intended to adopt the children. *Id.* Although the juvenile court terminated the father's parental rights of the father to the five-year-old and three-year-old children, the supreme court reversed based on the best-interest-of-the-child prong. *Id.* at 774. The supreme court noted the best-interest test has both backward-looking and forward-looking components. *Id.* at 771. The supreme court balanced the father's poor past behavior with his current and anticipated future behavior. *Id.* at 771-74. After such balancing, the supreme court found the father's progress in prison; his approaching release date; and the parties' divorce stipulation, which provided for current and future visitation; offset the negative factors sufficiently to cause it to conclude it was not in the children's best interest to terminate the father's parental rights. *Id.* at 774; *but see B.H.A.*, 938 N.W.2d at 233 (stating the conclusion in *Q.G.* "is constrained by exceptional circumstances and should not be relied upon as an endorsement of protecting an incarcerated parent's rights at the expense of a child's best interest").

This case is distinguishable from *Q.G.* Here, the child was nearly fourteen years old, as opposed to the five-year-old and three-year-old children involved in *Q.G.* The children in *Q.G.* had a stepfather who wanted to adopt them who had been involved in their lives for less than two years. Here, we have a stepfather

who wants to adopt who has, for all intents and purposes, been the child's only father figure for a long time, having been in the child's life since she was two years old. Additionally, while the father here is, by all accounts, a good father to his other child and is otherwise a responsible person—in contrast to the drug-addled, abusive, incarcerated father in *Q.G.*—those details make it even less excusable for him to have had no meaningful role in the child's life since the child was approximately eighteen months old. While the father in *Q.G.* exhibited horrible parenting, it was for a limited period of time and the supreme court held out hope, based on his continued interest in the children and his progress while in prison, the father would be able to positively contribute to the children's lives. *Id.* Here, the twelve-year period over which the father did nothing meaningful to show an interest in or be a part of the child's life supports the juvenile court's finding that termination of parental rights of the father is in the child's best interest.

### C. Other Issues.

As previously noted, the father raises two additional issues relating to the record. The first additional issue is the father's argument it was error for the juvenile court to consider the guardian ad litem's report when the report was not offered into evidence. We find this argument to be without merit for two reasons. First, at the beginning of the hearing, the juvenile court noted the guardian ad litem filed a report and was not intending to appear for the hearing and further noted the court's understanding that this was done "with the consent of the parties." The juvenile court then asked whether its understanding was correct, to which the attorneys for both parties stated, "Yes, Your Honor." Based on this exchange, it appears the father consented to consideration of the guardian ad litem's report.

Second, on our de novo review, whether we consider or do not consider the guardian ad litem's report, the result is the same. Even if the father did not consent to the juvenile court's consideration of the guardian ad litem's report and we did not consider it, it would not change the outcome. *See Erickson v. Blake*, No. 15-0251, 2016 WL 1130578, at *1 (Iowa Ct. App. Mar. 23, 2016) ("To the extent any evidence was improperly considered by the district court, reversal is not required given our de novo review of the record on appeal."). Therefore, this issue does not warrant reversal.

The second additional issue is the father's claim the juvenile court erred by not keeping the record open to allow the record to be supplemented by deposition testimony from the father's mother. We review a court's decision on whether to keep the record open for an abuse of discretion. *See Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 634 (Iowa 1996). The supplemental testimony the father sought to introduce concerned disputed testimony related to a claimed offer to allow the paternal grandmother to see the child, which fell through, and who was responsible for the failed visit. We agree with the reasons given on the record by the juvenile court for the refusal to keep the record open and find no abuse of discretion. While all the reasons given by the juvenile court supported the decision to not keep the record open, we particularly note that the evidence related to a collateral issue that would not have been helpful in deciding the issues in this case (i.e., the paternal grandmother's efforts to see the child rather than the father's efforts). Similarly, even if such evidence related to the mother's credibility, it would not have changed the outcome. On our de novo review, even if the record had been left open and the paternal grandmother's testimony established the mother

had never offered to allow the child to visit the grandmother, had unilaterally retracted such an offer, or had testified untruthfully about such collateral events, it would not change our decision in this matter. *See Erickson*, 2016 WL 1130578, at *1. Therefore, this issue also does not warrant reversal.

## IV. Conclusion.

On our de novo review, we find the statutory grounds for termination of parental rights of the father have been established by clear and convincing evidence. In addition, termination of parental rights has been established to be in the child's best interest by clear and convincing evidence. Therefore, we affirm the juvenile court.

**AFFIRMED**.