**IN THE COURT OF APPEALS OF IOWA**

No. 23-1028
Filed July 3, 2024


IN RE THE MARRIAGE OF LORIEL R. BASHORE
AND JAMES M. BASHORE

Upon the Petition of
LORIEL R. BASHORE, n/k/a LORIEL R. NORDMEYER,
        Petitioner-Appellee,

And Concerning
JAMES M. BASHORE,
        Respondent-Appellant.
_____


        Appeal from the Iowa District Court for Pottawattamie County, Greg W.

Steensland, Judge.


        The respondent-husband appeals the dissolution decree.  **AFFIRMED AS**

**MODIFIED.**


        Brody D. Swanson of Peters Law Firm, P.C., Council Bluffs, for appellant.

        Michael J. Winter, Council Bluffs, for appellee.


        Heard by Bower, C.J., and Tabor and Greer, JJ., but decided by Tabor, P.J.,

Greer, J., and Bower, S.J.*

        *Senior judge assigned by order pursuant to Iowa Code section 602.9206

(2024).

**GREER, Judge.**

James Bashore appeals the decree dissolving his marriage to Loriel Bashore (now known as Loriel Nordmeyer). James challenges the district court's admission of exhibit 26, the spousal-support provision, the child-support provision, the division of marital property, and the award of $4000 in trial attorney fees to Loriel. Loriel asks that we affirm the district court and award her $2500 in appellate attorney fees. We address these challenges below.

**I. Background Facts and Proceedings.**

James and Loriel were married in 2002. They have one child, F.A.B., who was born in 2004. James began serving in the Army National Guard in 1983 and continued to serve at the time of the dissolution trial in 2023. He was stationed in Oklahoma, where he had been living for more than twelve months, while Loriel remained in Iowa in the family home with F.A.B.

James was fifty-six years old and in good health at the time of trial. He testified he faces mandatory retirement from the National Guard once he turns sixty unless he receives a waiver and is allowed to work until he reaches age sixty-two. James explained his pay included his salary, an allowance for housing, and basic subsistence; with all of those combined, his gross income was $164,000 annually at the time of trial. Because his future orders and age of retirement were not yet known, it was not clear what his military pension would be when he retired. But he anticipated he would receive at least $5182.68 per month; Loriel would also begin receiving payments within a few months of James' retirement, and her expected share was $1540 per month. In addition, Loriel would receive free health insurance after James retired.

Loriel turned sixty years old a couple weeks after the district court entered the dissolution decree in May 2023; she testified to a long list of medical ailments, including both physical and mental illnesses. While Loriel obtained a master's degree in accounting prior to the marriage and was licensed as a certified public accountant (CPA) when the parties wed, she had not held full-time employment outside the home since 2008 or 2009[1] and had allowed her CPA license to lapse in the early 2000s. Loriel testified she was not able to maintain full-time employment after then because F.A.B. had issues at school and needed a parent who could pick her up and be around during school-day hours; James was deployed overseas for six nine-month stints during the course of the marriage. According to her 2022 Social Security statement, in the twelve years from 2009 to 2020 (the last year with information included on the statement), Loriel earned some income in ten of those years. Her greatest earning year in that window was in 2012, with an income of $45,269, and her average annual income over the twelve years was $18,108.50. Loriel testified she last had paid employment in 2020, when she worked preparing tax returns for $35 per hour during tax season and earned $7178. Loriel maintained she did not intend to work outside the home again, stating she did "not feel [she] would be a good employee with all of [her] conditions and limitations with [her] family." She admitted that she previously applied for Social Security disability and was denied; when asked if she was ever going to reapply, she testified, "I've considered it, and I'm looking into it, but I don't know if

---

[1] This information came from Loriel's testimony; she was unsure whether the year was 2008 or 2009.

I qualify anymore.  I've had one Social Security person tell me that I'd no longer qualify."

F.A.B. is the adult child of the parties.  Loriel opined that F.A.B. is a dependent adult; James disagreed.  Loriel testified F.A.B. has "a lot of limitations due to her disability or special needs."  More specifically, Loriel testified F.A.B. has been diagnosed with having

> autism, high functioning, formally called Asberger's. . . .  Sensory processing disorder, which is the significant one causing issues over the last several years.  She's especially sensitive to lights and sounds, which can cause meltdowns and shutdown of her nervous system.
> She also has [attention-deficit/hyperactivity disorder].  She has central auditory processing disorder, which can make it difficult to process and interpret auditory information if the environment is not quiet.  Also difficult to concentrate in environments where there's background noise present.
> . . . .
> Severe migraine headaches due to her sensory processing disorder.  Sensitive to cold temperatures.  She gets swelling, especially in her hands.
> She has delayed sleep phase syndrome.  Trouble falling asleep, so she takes some medication for that.  Trouble staying asleep, so she takes melatonin with some other additives to it, natural additives.
> She's hyper mobile, which means she can extend her joints beyond where they're supposed to.  It can cause issues.  She has Osgood-Schlatter Disease, which is knee pain and inflammation.
> And she also suffers depression and anxiety, as well as panic attacks and [post-traumatic stress disorder], which she takes hydroxyzine for.  She has previously considered suicide due to her stress and anxiety.
> Hiatal hernia.  [F.A.B.] had a chiari malformation, and surgery was done in April of 2022.  Extreme physical pain with [premenstrual syndrome] and her menstrual cycle.  Occasional hearing loss for unexplained reasons.  Loss of balance, earaches, headaches, a high heart rate, reflux, esophagit[i]s, frequent gut issues with nausea after eating, and [irritable bowel syndrome].

Loriel and James agreed that F.A.B. is "highly intelligent" and scored at or near the top 1% in some state-wide testing.  James believed that F.A.B. could successfully

attend college, be self-sufficient, and take care of herself. Loriel seemed to question this assessment, pointing to the fact that F.A.B. had not yet obtained a high school diploma or its equivalent. Later, when asked if it was "realistic for [F.A.B.] to go off to college and live someplace away from" her, Loriel testified, "No. I don't think a college environment is proper for her sensory issues. . . . I believe she'll try to figure out some kind of trade that she can do part-time." Loriel testified she applied for F.A.B. to receive Social Security disability benefits, but that application was denied—she was in the process of appealing the decision.

F.A.B. attended the local high school until January 2023—the last semester of her senior year—when her attendance issues forced her to proceed with obtaining a GED. According to Loriel, F.A.B.'s

> [absenteeism] was getting excessive in January. With the addition of her sensory issues, she had gotten [COVID] and then got the flu. The teachers were having problems trying to figure out how to get her caught up, and the principal and school counselor suggested that maybe it is time to consider the HISET, which is the Iowa GED program.

F.A.B. was working toward obtaining her GED and was expected to have it completed within months of the date of trial.

Both parties agreed that one of the parties' three vehicles would be awarded to Loriel in the property distribution for F.A.B. to drive, and James testified as follows about F.A.B.'s social life:

> She would go out with friends. . . . They go out thrifting and things like—well, looking at thrift stores and things like that with her friends. As well as up until recently, after school activities. She's been—you should have seen her. She was in a play. She performed in a play. . . . She's also—I think it's called a quiz bowl where she competed for the high school . . . .

In the dissolution decree, the district court concluded F.A.B. was a dependent adult child and ordered James pay to F.A.B. directly child support of $1591 per month. James was also ordered to pay $3000 per month of spousal support to Loriel until he retired, she remarried, or either party died. The court divided the marital assets, noting James was receiving $265,848.33 in net value and Loriel was receiving $287,192.34 in net value (a difference of $21,344.01 in Loriel's favor). And, finally, the court ordered James to pay $4000 of Loriel's trial attorney fees.

James appeals, while Loriel asks that we affirm and award her $2500 in appellate attorney fees.

## II. Standard of Review.

"An action for dissolution of marriage is an equitable proceeding and, consequently, this court's review is de novo." *In re Marriage of Thatcher*, 864 N.W.2d 533, 537 (Iowa 2015) (citation omitted). This means that while we respect the district court's factual findings, especially on credibility issues, "we examine the whole record, find our own facts, and adjudicate rights anew on issues properly before us." *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 629 (Iowa 1996).

"We review evidentiary rulings and other 'matters relating to the course and conduct of a trial, not regulated by statute,' for abuse of discretion." *In re Marriage of Heiar*, 954 N.W.2d 464, 469 (Iowa Ct. App. 2020) (quoting *In re Marriage of Ihle*, 577 N.W.2d 64, 67 (Iowa Ct. App. 1998)).

**III. Analysis.**

**A. Evidentiary Challenge.** We start with James's evidentiary challenge, so we can determine the proper record for our review. James objected to Loriel's exhibit 26, a "Central Auditory Processing Evaluation" of F.A.B. dated January 22, 2020, on the grounds that "[it] was requested through discovery and was not provided." He also noted that it was not "listed on the Petitioner's Exhibit List" and was "just added on last night." The district court admitted the exhibit subject to the objection.

Iowa Rule of Civil Procedure 1.500(1)(a)(2) requires a party to:

without awaiting a discovery request, provide to the other parties:
> . . . .
> (2) All documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

"[O]ur rules are automatic concerning the use of evidence that a party failed to provide during discovery." *Kellen v. Pottebaum*, No. 18-1034, 2019 WL 2371924, at *3 (Iowa Ct. App. June 5, 2019). "If a party fails to provide information or identify a witness as required by rule 1.500 . . . the party is not allowed to use that information or witness to supply evidence . . . at a trial, unless the failure was substantially justified or is harmless." Iowa R. Civ. P. 1.517(3)(a). At trial and on appeal, Loriel offered no argument that her failure to produce the document before trial was substantially justified or was harmless.

Exhibit 26 was inadmissible. As we conduct a de novo review of dissolution proceedings, the proper remedy is excluding this evidence from our review. *See e.g.*, *In re Marriage of DeMoss*, No. 20-0418, 2020 WL 7021555, at *2 (Iowa Ct.

App. Nov. 30, 2020) ("Our review of dissolution-of-marriage cases is de novo. . . . If the exhibit was inadmissible, we may decide the case on the remaining record without remand."). We exclude exhibit 26 from our review of the record in deciding James's appeal.

**B. Spousal Support.** The district court ordered James to pay Loriel $3000 monthly in spousal support "until James retires, either party dies, or Loriel remarries, whichever occurs first." James contends that Loriel did not establish a need for spousal support or, alternatively, that her spousal support award should be reduced because of her earning capacity. In raising this issue, James challenges the district court's reliance on Loriel's testimony listing her many medical diagnoses, which she claimed prevented her from ever holding paid employment again.

To begin, we note that the district court did not identify the type of spousal support it was ordering. This hinders our review of the court's award, as "[e]ach type of spousal support has a different goal." *In re Marriage of Pazhoor*, 971 N.W.2d 530, 539 (Iowa 2022) (citation omitted). Both parties seem to assume the court was ordering traditional spousal support, which makes sense based on the facts that the marriage lasted more than twenty years and Loriel had limited paid employment during the marriage. *See id.* at 543 (recognizing traditional support is generally awarded in marriages of more than twenty years where one spouse was absent from the workplace). Yet the court ordered that the support would end when James retires. *See In re Marriage of Gust*, 858 N.W.2d 402, 412 (Iowa 2015) ("With respect to duration, we have observed that an award of traditional spousal support is normally payable until the death of either party, the payee's remarriage,

or until the dependent [party] is capable of self-support at the lifestyle to which the party was accustomed during the marriage.").  And our supreme court has clearly held that "future retirement will ordinarily be considered to raise too many speculative issues to be considered in the initial spousal support award" so "unless all of the factors in Iowa Code section 598.21C(1) can be presently assessed, future retirement is a question that can be raised only in a modification action subsequent to the initial spousal support order."  *Id.* at 416, 418.

Still, as only James has challenged the award of spousal support, we conduct a de novo review and determine whether we find the award of $3000 per month in spousal support to Loriel to be equitable.[2]  *See Pazhoor*, 971 N.W.2d at 537 ("We give the district court considerable latitude, and will only disturb the award 'when there has been a failure to do equity.'" (citations omitted)).  To do so, we consider the criteria provided in Iowa Code section 598.21A(1):

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.

---

[2] We do not review the duration of the support; Loriel did not appeal and therefore has not challenged that the award of support was limited to when James retires.

h. Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
i. The provisions of an antenuptial agreement.
j. Other factors the court may determine to be relevant in an individual case.

James attacks the evidence Loriel's health prevents her from maintaining paid employment outside of the home; he focuses on her earning capacity at the time the marriage began—when she was a licensed CPA and worked full-time hours. But our review of the evidence is not centered on the parties at the time the marriage began in 2002. Rather, we consider the life patterns set during the parties' long-term marriage and consider the earning potential of both spouses as they existed at the time of trial. *See Gust*, 858 N.W.2d at 410. Loriel had full-time employment outside of the home very few years of the long marriage. And after last leaving full-time employment by 2009, she averaged only $18,108.50 annually from 2009 to 2020, with no earnings in 2021, 2022, or the first quarter of 2023. In contrast, although the district court determined James earned $164,000 annually at the time of the dissolution trial, he provided documentation that his housing allowance would drop after the dissolution was final, making his gross annual income $156,792.

Even if Loriel was physically able to return to employment, there is no evidence she could "become self-sufficient at 'a standard of living reasonably comparable to that enjoyed during the marriage.'" *Pazhoor*, 971 N.W.2d at 543 (citation omitted). Here, Loriel has a real need for James's support, and he is able to pay the $3000 per month awarded by the district court. *See id.* ("The award and

duration of a traditional alimony award is 'primarily predicated on need and ability.'" (citation omitted)).  We affirm the award of spousal support.

**C. Support of a Dependent Adult Child.**  The parties' daughter, F.A.B., was eighteen years old at the time of the dissolution trial.  Loriel claimed she was a dependent child and requested child support.  The district court agreed, ordering James to pay $1591 per month in support to F.A.B. directly indefinitely.  James challenges the award of child support.

"A parent's legal obligation to support his or her children does not necessarily end when the child reaches the age of majority."  *In re Marriage of Nelson*, 654 N.W.2d 551, 553 (Iowa 2002).  Iowa Code section 598.1(9) defines "support" or "support payments" and includes "support for a child of any age who is dependent on the parties to the dissolution proceedings because of physical or mental disability."  While the district court concluded the pertinent question was "whether or not [F.A.B.] is capable of taking care of herself," our supreme court has said that "[t]o determine whether a child is 'dependent,' we consider the child's ability to be gainfully employed and whether the child receives income or benefits from other sources."  *Nelson*, 654 N.W.2d at 553.

Nothing in the record goes directly to establish that F.A.B. is a dependent adult child, other than Loriel's long list of diagnoses that F.A.B. has received.  But there is little to no evidence that specifically explained how the diagnoses translated to F.A.B. being unable to be gainfully employed and, thus, dependent on the support of her parents for life.  Instead, the record showed that F.A.B. is a highly intelligent young woman.  She participated in school activities, like a school play and a quiz bowl competition, and attended the local school until bouts with

COVID and the flu caused her to fall too far behind to rejoin her classes during the last semester of her senior year. As of the time of trial, she was actively working toward obtaining her GED and was expected to finish soon. We do not question the accuracy of Loriel's list of F.A.B.'s medical conditions, but we cannot assume a diagnosis means a disability that prevents her from working at a paying job or otherwise being self-sufficient. In fact, all the trial evidence suggests that both Loriel and James find F.A.B. capable and recognize that she can act independently—Loriel asked the court to award one of the parties' vehicles to F.A.B. directly instead of to either party, and both parties agreed that the child-support payments could be made to F.A.B. directly. Plus, contrary to the district court's fact findings, the evidence showed the F.A.B. has been denied for Social Security disability. *Cf. id.* at 553–54 (considering that the Social Security Administration held that the adult child was disabled under the federal disability rules when affirming district court's ruling that adult child was a dependent adult).

F.A.B. may require some accommodation, and we recognize that not every job would be appropriate for F.A.B.—for example, we understand she would likely not be successful in a noisy work environment. But that is different than concluding no job is tenable, especially considering today's work environment where doing office work from home is possible. And even Loriel admitted, "[T]here is probably something out there. We just have not located it. We're working with the vocational rehab services of Iowa to try to determine those possibilities." Considering the subject of future education, we note that James previously transferred his GI Bill benefits to F.A.B., which would entitle her to the full cost of

public, in-state tuition and fees plus money for housing, books, and supplies to support F.A.B.'s college efforts.

To set support for F.A.B., the trial court applied the child support guidelines, but the child support guidelines do not apply to support involving a dependent adult child.[3] *See id.* at 553 ("Our child support guidelines do not apply to support involving dependent adult children."). Instead, considering both parents' ability to contribute, the district court had to determine what amount of support is "reasonable and necessary." *Id.* (citation omitted). On this record, we do not have the benefit of testimony or an exhibit reflecting the estimated monthly expenses of F.A.B. "Case law requires a determination of [F.A.B.'s] financial needs." *State ex rel. Moore v. McCampbell,* No. 09-1029, 2010 WL 2079701, at *3 (Iowa Ct. App. May 26, 2010). And, while we have Loriel's financial affidavit showing her living expenses, those are presumably covered by the spousal support, any of her part-time earnings, and the expectation of future retirement payments.

Here, Loriel was the party who requested support for F.A.B., so she bore the burden of proof. *See* Iowa R. Civ. P. 6.904(3)(e) ("Ordinarily, the burden of proof on an issue is upon the party who would suffer loss if the issue were not established."). And we agree with James that Loriel has not met her burden to establish that F.A.B. is a dependent adult child. As noted, while she provided a

---

[3] In reviewing the child support worksheet exhibit that calculated the award given by the court, we note that Loriel put $0 as her income and did not add any part-time earnings or the spousal support she requested. *See* Iowa Ct. R. 9.5(1)(a)(1) ("If spousal support is to be paid in the pending matter, whether temporary or permanent, it will be determined first and added to the payee's income and deducted from the payor's income before child support is calculated."). She also testified and reflected in her expenses that "the Army" has F.A.B. covered for her health insurance needs.

long list of diagnoses for F.A.B., this alone—without more explanation of how those diagnoses interplay in F.A.B.'s day to day life and impact her experiences and abilities—is not enough to establish that F.A.B. will not ever be gainfully employed, especially considering the other record evidence. *See In re Marriage of Hansen*, 514 N.W.2d 109, 112 (Iowa Ct. App. 1994) ("Not all children with disabilities necessarily qualify for support beyond their eighteenth birthday."). We are not persuaded by F.A.B.'s lack of employment history; while this may be significant in other cases, it has limited value when the child in question is only eighteen years old, has not yet finished high school, and was otherwise involved with extracurricular activities during her school years.

We reverse the district court's award of child support.

**D. Division of Marital Property.** James challenges the district court's division of marital property, arguing it was inequitable for the court to award Loriel $21,344.01 more in net value without providing any explanation for the unequal split. While his brief on appeal focuses on the $21,344.01 difference in listed marital assets, we note the district court also ordered each party to retain the balances of bank accounts listed in their individual names (as opposed to joint accounts) without including the values in the list of marital assets. Loriel had nearly $10,000 in her individual accounts, while James had approximately $2000 in his. So, in reality, Loriel received an additional $8000 of marital property due to this division, leaving her with approximately $29,344.01 more in marital assets than James. *See In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006) ("All property of the marriage that exists at the time of the divorce, other than gifts and inheritances to one spouse, is divisible property."); *see also* Iowa Code

§ 598.21(5). That said, we focus on the complaint James actually lodged—the $21,344.01 difference.

As James recognizes, while Iowa is an equitable division state, "Iowa courts do not require an equal division or percentage distribution." *In re Marriage of Hazen*, 778 N.W.2d 55, 59 (Iowa Ct. App. 2009). "The determining factor is what is fair and equitable in each circumstance," *id.*, and we consider the criteria in Iowa Code section 598.21(5) in deciding whether an award is equitable:

> a. The length of the marriage.
> b. The property brought to the marriage by each party.
> c. The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.
> d. The age and physical and emotional health of the parties.
> e. The contribution by one party to the education, training, or increased earning power of the other.
> f. The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.
> g. The desirability of awarding the family home or the right to live in the family home for a reasonable period to the party having custody of the children, or if the parties have joint legal custody, to the party having physical care of the children.
> h. The amount and duration of an order granting support payments to either party pursuant to section 598.21A and whether the property division should be in lieu of such payments.
> i. Other economic circumstances of each party, including pension benefits, vested or unvested. Future interests may be considered, but expectancies or interests arising from inherited or gifted property created under a will or other instrument under which the trustee, trustor, trust protector, or owner has the power to remove the party in question as a beneficiary, shall not be considered.
> j. The tax consequences to each party.
> k. Any written agreement made by the parties concerning property distribution.
> l. The provisions of an antenuptial agreement.

m. Other factors the court may determine to be relevant in an individual case.

Given that James is a few years younger than Loriel, in better health, and has a much greater earning capacity, we cannot say it was inequitable for the district court to award Loriel slightly more of the marital property. Plus, it seems clear from both parties' testimony that the 2008 Honda—which made up $5942 of the $21,344.01 James objects to—was a vehicle that would ultimately be given to F.A.B. in accordance with both parents' wishes. Thus, the difference in value between assets assigned to Loriel and James, was only $15,402.01 (relying on James's original calculation). Even if we considered the larger difference in the division, because of other factors we are statutorily required to consider, we find this division of assets is equitable under the circumstances.

We affirm the district court's division of marital property.

**E. Trial Attorney Fees.** The district court required James to pay $4000 of Loriel's trial attorney fees. James challenges this award, noting that at the time of the trial, Loriel had about $9000 in her personal bank account while he had only $2000 in his.

We review the district court's award of trial attorney fees for an abuse of discretion. *See Sullins*, 715 N.W.2d at 255. "Whether attorney fees should be awarded depends on the respective abilities of the parties to pay." *Id.* (quoting *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994)). While Loriel had managed to save more under the temporary order than James had, James was still earning $164,000 annually at the time of the trial while Loriel's only source of income going forward was $3000 per month of spousal support. The district court

did not act unreasonably when it ordered James to pay $4000 of Loriel's trial attorney fees.

**F. Appellate Attorney Fees.**  Loriel seeks $2500 in appellate attorney fees.

> Appellate attorney fees are not a matter of right, but rather rest in this court's discretion.  Factors to be considered in determining whether to award attorney fees include: "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."

*Id.* (citation omitted).  While James has had some success on appeal, we balance his success with a focus on his ability to pay $2500 in comparison to Loriel's obvious need, and we award Loriel $2500 in appellate attorney fees.

**IV. Conclusion.**

Because exhibit 26 was inadmissible, we exclude it from our review on appeal.  We affirm the spousal-support provision, the property division, and the $4000 award of trial attorney fees to Loriel.  We reverse the district court's determination that F.A.B. is a dependent adult and the corresponding child-support provision.  Finally, we award Loriel $2500 in appellate attorney fees.

**AFFIRMED AS MODIFIED.**