# IN THE COURT OF APPEALS OF IOWA

No. 24-0995
Filed August 21, 2024

**IN THE INTEREST OF K.R.,**
**Minor Child,**

**A.T., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Scott County, Korie Talkington, Judge.

The mother appeals the termination of her parental rights to one child. **AFFIRMED.**

Jean Capdevila, Davenport, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Barbara Maness, Davenport, attorney and guardian ad litem for minor child.

Considered by Badding, P.J., Chicchelly, J., and Potterfield, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2024).

**POTTERFIELD, Senior Judge.**

The juvenile court terminated the mother's parental rights to K.R., born in 2014, pursuant to Iowa Code section 232.116(1)(d), (e), (f), and (i) (2024).[1]  The mother appeals, challenging the statutory grounds for termination and whether the loss of her rights is in K.R.'s best interests.

Our review is de novo.  *In re L.B.*, 970 N.W.2d 311, 313 (Iowa 2022).  This means that while we respect the juvenile court's factual findings, especially on credibility issues, "we examine the whole record, find our own facts, and adjudicate rights anew on issues properly before us."  *Sun Valley Iowa Lake Ass'n v. Anderson*, 551 N.W.2d 621, 629 (Iowa 1996).

**Statutory Grounds.**  The mother challenges each of the four statutory grounds relied on by the juvenile court: paragraphs (d), (e), (f), and (i) of section 232.116(1).  While the mother challenges the proof for each, "we may affirm the juvenile court's termination order on any ground that we find supported by clear and convincing evidence."  *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010).  We choose to consider paragraph (f), which allows for termination when:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

Iowa Code § 232.116(1)(f).

---

[1] The father's parental rights were also terminated; he does not appeal.

The mother challenges only the fourth element—whether K.R. could be returned to her custody at the time of the termination trial. *See In re A.S.*, 906 N.W.2d 467, 473 (Iowa 2018) (considering whether the child could be returned at the time of the termination trial). With that in mind, we review the underlying facts.

K.R. lived with the mother in Florida until he was about two years old. At that time, the mother gave the paternal great-grandmother (who also resided in Florida) temporary custody of the child so she could enter residential treatment for alcohol abuse; the mother expected the arrangement to last one to two years. About six months later, the great-grandmother allowed the father to take K.R., and the father brought him to live in Iowa. Between the time the father took him in approximately 2017 and the termination trial in spring 2024,[2] the mother did not have any in-person contact with K.R. While she had some phone and video contact with the child, the mother testified the father generally blocked her relationship with K.R.[3] and she had almost no contact with him for about two to three years before the Iowa Department of Health and Human Services (HHS) became involved in December 2022.[4]

---

[2] The termination trial took place over two days, April 11 and May 9, 2024.

[3] There was testimony that various family members of the father facilitated some phone and video calls between the mother and K.R. at times the father was not present.

[4] HHS became involved when K.R. was nearly eight years old after it was discovered the father and paternal grandmother were using methamphetamine in the home. K.R. tested positive for methamphetamine at the time of removal. K.R. had never been enrolled in school, and there was no evidence he was being appropriately homeschooled. Based on what HHS learned after it became involved, K.R. was largely kept in an enclosed play area or given a tablet to watch for long stretches of time, without any social interaction. K.R. had been seen by medical professionals only one time since the father brought him to Iowa.

The mother continued to live in Florida at the time of the termination trial. She had another child who was nearly four years old and had never been involved with the Florida equivalent of HHS. The mother and child lived in a shelter, as they had been for more than a year, and the mother was working toward obtaining her high school equivalency diploma. She consistently met with both a therapist and psychiatrist, and she was prescribed medications to treat her diagnoses of anxiety, depression, and bipolar disorder. There were no concerns the mother was using illegal substances.

There were questions, however, about the mother's ability to financially support herself and her children. The mother had not maintained independent housing; she was without a home when she gave the great-grandmother temporary custody of K.R. and entered a residential treatment program, where she stayed for about one and a half years. After that, she lived with a friend for several years before moving in with a romantic partner.[5] The mother moved into a domestic violence shelter in early 2023 and remained there for more than a year—until she moved to a different long-term shelter in March 2024. The mother has little history of paid employment, and there was no timeline for when the mother expected to leave the shelter or become self-sufficient.

Additionally, while verbal reports indicated that the process went well and Florida was expected to approve the mother and the shelter she was living in as appropriate for K.R, as of the end of the termination trial, there was not yet an

---

[5] The mother's testimony implied that she helped out around the house by providing childcare and housekeeping in lieu of paying to stay with the friend.

approved ICPC home study[6] for the mother. And all parties agreed that this fact prevented the court from ordering the return of K.R. to the mother's custody. Additionally, it was undisputed that K.R. was "desperate for permanency." K.R.'s therapist wrote a letter on May 1, 2024, in which she explained that she had been providing K.R. weekly therapy since August 2023 and opined:

> [K.R.] has a lot of anxiety and stress about his living environment and lack of understanding about his future. . . . [He] has a strong desire to reside with Teresa . . ., former FSRP worker for him[, who] is working to become a foster/adoptive placement for him, however, he has guilt for not wanting to be with his mother or grandmother. There is so much unknown in this young boy's life that he cannot succeed with the amount of turmoil occurring.

K.R. was also taking medication to help manage the anxiety he was experiencing. And still, the case manager testified K.R. is "absolutely" one of the most anxious children with whom the case manager had ever worked.

The case manager also testified there was not a bond between K.R. and the mother. Besides noting that K.R. had not seen the mother in person in about seven years, the case manager testified:

> Just from the phone calls that I've kind of orchestrated [between K.R. and the mother] or in talking with the foster family, it's more surface-level things of how is school going, how's, you know, this going. She does mention that she loves him and cares for him and is hoping to get him back, but as far as like an actual bond, no.

---

[6] The purpose of the interstate compact on the placement of children (or ICPC) is for participating states to

> to cooperate with each other in the interstate placement of children to the end that . . . [*inter alia* ] [t]he appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement . . . [and] [t]he proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

Iowa Code § 232.158(1)(b), (c).

He recognized the mother continued to generally have consistent phone call visits with K.R. and that it would be difficult to re-establish a relationship with a child through phone and video calls alone, but the seven years of no in-person contact and the two to three years of almost no contact at all left it so the case manager thought it was "hard to say" whether K.R. would even be able to recognize his mother if he came across her in public.

The determinative question regarding whether termination is appropriate under paragraph (f) is whether the parent contesting termination is in the position to take custody of the child at the time of the termination trial. *See In re Z.P.*, 948 N.W.2d 518, 524–25 (Iowa 2020) (considering paragraph (h)(4), which is the same element as (f)(4)). Here, we agree with the juvenile court and parties that the lack of an approved ICPC home study prevented the juvenile court from returning K.R. to the mother's custody. *See* Iowa Code § 232.158(3)(d) (requiring, among other things, that a "child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child"). And while we recognize that the fact that ICPC home study was not completed is not the mother's fault, "juvenile law is not a fault-based edifice like tort law." *Z.P.*, 948 N.W.2d at 523. "Our statutes reflect 'policies that are meant to keep children from languishing in foster care.'" *Id.* (quoting *In re J.E.*, 723 N.W.2d 793, 802 (Iowa 2006) (Cady, J., concurring specially)). Because K.R. could not be returned to the mother's custody at the time of the termination trial, the statutory ground for termination under section 232.116(1)(f) was proved.

**Best Interests.** Next, the mother argues termination of her parental rights is not in K.R.'s best interests. "In considering whether to terminate the rights of a parent under this section, [we] give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). While the mother generally completed visits as asked of her and tried to re-establish a connection with K.R., the juvenile court concluded the mother was "essentially a stranger to" K.R. at the time of the termination trial: "[f]or many reasons, some [the mother's] fault and some not, she has only a shallow relationship with [K.R.]" When we consider this lack of close bond coupled with K.R.'s heightened need for a safe, stable home, which the mother was not yet able to provide him, we conclude termination of the mother's parental rights is in K.R.'s best interests.

We affirm the termination of the mother's parental rights.[7]

**AFFIRMED.**

---

[7] While the mother asked the juvenile court to grant her more time to achieve reunification, the mother did not raise that request on appeal.